Benson A. WOLMAN et al., Plaintiffs,

v.

Martin W. ESSEX, Superintendent of Public Instruction of the State of Ohio, State Board of Education, et al., Defendants.

No. C–2–75–792.

United States District Court,
S. D. Ohio, E. D.

June 21, 1976.

---

Joshua K. Kancelbaum, Cleveland, Ohio, Clyde Ellis, Stanley K. Laughlin, Jr., Columbus, Ohio, for plaintiffs.

David J. Young, Thomas V. Martin, Asst. Atty. Gen. of Ohio, Columbus, Ohio, for defendants.

Before JOHN W. PECK, Circuit Judge, and KINNEARY and DUNCAN, District Judges.

## OPINION

KINNEARY, District Judge.

In this action plaintiffs attack the constitutionality of Ohio Revised Code Section 3317.06, pursuant to which certain services and materials routinely made available to students attending public schools throughout the state are made available to elementary and secondary nonpublic schoolchildren as well.

This matter is before the Court on the complaint and the answers, various memoranda submitted by the parties, an extensive stipulation of facts and the exhibits of the parties. The action was commenced under the provisions of Title 42, United States Code, Section 1983, and the Court has jurisdiction over the subject matter of this action under the provisions of Title 28, United States Code, Section 1343.

On July 1, 1975 this Court upheld the constitutionality of Ohio Revised Code Section 3317.062, the predecessor statute to that under consideration in this action, to the extent that the former statute provided only secular, neutral and nonideological services and materials to students attending nonpublic schools. While appeal of this Court's decision was pending, the United States Supreme Court rendered its decision in *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), and held that a Pennsylvania statute similar to the former Ohio statute was unconstitutional.

The Supreme Court vacated the judgment of this Court and remanded the case for further consideration in light of its decision in *Meek*. The Ohio General Assembly thereafter repealed the former statute and enacted the provisions now codified in

§ 3317.06 O.R.C. On November 17, 1975, this Court entered a consent order declaring the former statute to be violative of the First and Fourteenth Amendments.

In this action, this Court is once again called upon to review the constitutionality of Ohio's legislative attempts to provide auxiliary services and educational materials to the nonpublic schoolchildren throughout the state.

A three judge court was convened pursuant to Title 28, United States Code, Sections 2281 and 2284. On December 10, 1975, a temporary restraining order was issued prohibiting the defendants from implementing any provision of the statute. With the consent of the parties, that order was subsequently modified to permit the expenditure of monies necessary to purchase textbooks and textbook substitutes and to lend such items to nonpublic school pupils or to their parents pursuant to the statute.

I

Plaintiffs in this action are citizens and taxpayers of the United States and of the State of Ohio, and this Court concludes that these individual plaintiffs have standing to challenge the statute. *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The defendants are various state and local officials charged with the implementation of the statute, and parents of children attending various nonpublic schools and who are potential recipients of the materials and services authorized by the statute.

Section 3317.06 O.R.C. was enacted as a portion of an omnibus education bill, and most of its sections relate to public school assistance. Briefly, the statute authorizes expenditure of monies by local school districts to purchase and supply to elementary and secondary schoolchildren attending nonpublic schools within the districts or to their parents the following independent and fully severable materials and services: secular textbooks, or textbook substitutes, approved for use in the public schools, § 3317.06(A) O.R.C.; secular and nonideological instructional materials and equipment as are

in use in the public schools and which are incapable of diversion to religious use, and to hire clerical personnel to administer the lending program, § 3317.06(B), (C) O.R.C.; speech and hearing diagnostic services, physician, nursing, dental and optometric services, and diagnostic psychological services, to be provided in the nonpublic schools, § 3317.06(D), (E), (F) O.R.C.; therapeutic psychological and speech and hearing services, guidance and counseling services, remedial services, and programs for the deaf, blind, emotionally disturbed, crippled and physically handicapped children, to be provided in the public school, in public centers or in mobile units located off the nonpublic school premises, and transportation as needed, § 3317.06(G), (H), (I), (K) O.R.C.; standardized tests and scoring services such as are in use in the public schools of the state, § 3317.06(J) O.R.C.; field trip transportation and services as are provided to public school students, § 3317.06(L) O.R.C.

Under the statute, funds appropriated by the legislature are allocated by the Ohio Department of Education to the various local public school districts twice per year, based upon the estimated annual average daily membership in nonpublic elementary and high schools located within the district. Each local school district will then utilize the money either to purchase approved secular textbooks, instructional materials and equipment, standardized testing and scoring services and field trip transportation or to provide the diagnostic, remedial and therapeutic services authorized by the statute.

Textbooks, instructional materials and equipment, and standardized tests and scoring services are to be purchased directly from the supplier by the local public school district. Auxiliary health and special educational service personnel will be hired and paid by the local public school districts. Such personnel, furthermore, are to be controlled and supervised by the local public school districts.

Provision of the services or materials authorized by the statute is initiated by an application submitted to the local public school district from nonpublic school repre-

sentatives. This application receives administrative approval or disapproval by the local public school district after consultation with a field service coordinator from the Ohio Department of Education, and formal approval from the local public school board of education.

The statute makes clear that the materials and services available under the statute are limited to those available to pupils attending the public schools within the district and, further, that the materials and services are to be made available to pupils attending only those nonpublic schools whose admission policies make no distinction as to race, creed, color or national origin of either its pupils or of its teachers.

## II

According to the stipulations of the parties, approximately 96 percent of Ohio's nonpublic schools are denominational, and during the 1974–1975 academic year, Ohio's nonpublic schools educated over 250,000 students. The parties have furnished to the Court information regarding the operations of the Columbus Catholic elementary and secondary schools, stipulated to be fairly representative of the Catholic schools throughout the State of Ohio, which constitute approximately 86 percent of Ohio's nonpublic schools. These schools operate under the general supervision of the diocesan Bishop. While most (but not all) of the principals of such schools are religious personnel, more than two-thirds of the teachers in such schools are not. Further, most religious teachers no longer wear distinctive religious habits. Finally, the facilities of these schools often display a Christian symbol as well as the American flag.

All such schools teach the secular subjects required to meet the state minimum standards, and the parties have stipulated that, during the required secular courses, the pupils attending nonpublic schools are taught a course content generally equivalent to

that taught in public schools. The state mandated five-hour school day is expanded in such schools to accommodate religious instruction and devotion for Catholic students. Discussion of topics upon which the Catholic Church has articulated a position is programmed to take place only in religion classes.

Teachers in such schools, a majority of whom are members of the Catholic faith, are employees of the schools in which they teach. However, no teacher in any such school is required to teach religious doctrine as a part of or to integrate religious doctrine into the required secular courses taught in the school.

Finally, it is to be noted that the statute challenged in this action extends the benefits provided thereunder only to those pupils attending nonpublic schools whose admission policies and hiring practices with respect to teachers make no distinction as to race, creed, color or national origin.

Although the stipulations of the parties evidence several significant points of distinction, the character of these schools is substantially comparable to that of the schools involved in *Lemon v. Kurtzman,* 403 U.S. 602, 615–18, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).[1]

## III

■ The Establishment Clause prohibits "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Commission,* 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). However, the Constitution does not compel an absolute separation between the state and religious institutions. *Committee for Public Education and Religious Liberty v. Nyquist,* 413 U.S. 756, 760–61, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). Thus some benefits extended to the public at large are constitutionally permissible, despite the resulting indirect and incidental benefits flowing to religious institutions.

1. But compare this profile with those in *Roemer v. Board of Public Works of Maryland,* — U.S. ——, 96 S.Ct. 2337, 49 L.Ed.2d 179, (1976); *Hunt v. McNair,* 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973); *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971).

*Lemon v. Kurtzman, supra,* 403 U.S. 602, 614, 91 S.Ct. 2105, 29 L.Ed.2d 745. The Supreme Court has never held that all public aid to private education is prohibited:

> [W]here carefully limited . . . , States may assist church-related schools in performing their secular functions, . . . not only because the States have a substantial interest in the quality of education being provided by private schools, . . . but more importantly because assistance properly confined to the secular functions of sectarian schools does not substantially promote the readily identifiable religious mission of those schools and it does not interfere with the free exercise rights of others.

*Norwood v. Harrison,* 413 U.S. 455, 468, 93 S.Ct. 2804, 2812, 37 L.Ed.2d 723 (1973).

In *Lemon v. Kurtzman, supra,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745, the Supreme Court established a tripartite Establishment Clause test by which state action in this area is to be judged.

> . . . First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, *Board of Education v. Allen,* 392 U.S. 236, 243 [88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060] (1968); finally, the statute must not foster "an excessive government entanglement with religion."

403 U.S. at 612, 91 S.Ct. at 2111. This test, clear in its articulation if difficult in its application, is stated in terms of degree.

> It is well to emphasize, however, that the tests must not be viewed as setting the precise limits to the necessary constitutional inquiry, but serve only as guidelines with which to identify instances in which the objectives of the Establishment Clause have been impaired.

*Meek v. Pittenger, supra,* 421 U.S. 349, 359, 95 S.Ct. 1753, 1760, 44 L.Ed.2d 217 (1975).

Because the state has a legitimate interest in the care and education of its children, it cannot be denied that the legislation presently before this Court meets the first prong of the constitutional standard. *See Kosydar v. Wolman,* 353 F.Supp. 744, 751 (S.D.Ohio 1973), *aff'd. sub nom Grit v. Wolman,* 413 U.S. 901, 93 S.Ct. 3062, 37 L.Ed.2d 1021 (1974); *Wolman v. Essex,* 342 F.Supp. 399, 411 n.13 (S.D.Ohio), *aff'd.,* 409 U.S. 808, 93 S.Ct. 61, 34 L.Ed.2d 69 (1972).

The statute must be carefully examined, however, in an effort to determine whether the legislation has the principal or primary effect of advancing religion or results in an excessive government entanglement with religion.

### IV

#### A. Textbooks

Section 3317.06(A) O.R.C. authorizes the lending of such secular textbooks as have been approved by the superintendent of public instruction for use in public schools to pupils attending nonpublic schools or to their parents. The statute defines "textbook" to mean "any book or book substitute which a pupil uses as a text or text substitute in a particular class or program in the school he regularly attends." The parties have stipulated that the materials provided under this portion of the statute shall be limited to "books, reusable workbooks, or manuals, whether bound or in looseleaf form, intended for use as a principal source of study material for a given class or group of students, a copy of which is expected to be available to the individual use of each pupil in such class or group."

Administratively, individual requests for such materials are to be submitted by nonpublic pupils or by their parents, and those requests will then be summarized by the nonpublic school and forwarded to the appropriate public school official.

On its face, this aspect of the statute is constitutionally indistinguishable from the textbook provisions upheld in *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) and in *Meek v. Pittenger, supra,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217. This Court is therefore of the opinion that that portion of § 3317.06 O.R.C. providing textbooks or textbook substitutes to nonpublic pupils or to their parents does not contravene the First or Fourteenth Amendments.

### B. Instructional Material and Equipment

Section 3317.06(B) and (C) O.R.C. authorizes the local school districts to purchase and lend to nonpublic school pupils or to their parents instructional materials and equipment that are incapable of diversion to religious use, and to hire clerical personnel to administer the program. Examples of equipment supplied in the past under predecessor statutes include weather forecasting charts, lunar terrain models, fossil collections, and metric system materials. The statute further provides that the materials and equipment lent pursuant to the statute may be stored on the premises of the nonpublic school and the clerical personnel hired to administer the lending program may perform their duties upon the premises of the nonpublic school when necessary.

The duties of the clerical personnel hired to administer the lending program include: distribution of loan request forms and receipt of requests, maintenance of inventory, collection and distribution of materials and equipment, maintenance of custody, and storage and other duties necessary for the efficient implementation of the program.

The parties have stipulated that most public school districts will simultaneously purchase all the equipment and materials necessary for all the students in the district, both public and nonpublic, from common suppliers and, where appropriate, will employ a bidding procedure in the purchases.

The United States Supreme Court in *Meek v. Pittenger, supra,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217, was presented with a Pennsylvania program authorizing the lending to the nonpublic schools of that state instructional materials and equipment. The Supreme Court recognized that the materials and equipment to be provided under the statute challenged in that action could not be diverted to religious use and thus would not involve the state in an entangling policing relationship with the nonpublic schools. *Meek, supra,* 421 U.S. at 365, 95 S.Ct. 1753. Nevertheless, the Supreme Court found the program to be violative of the Establishment Clause, and the Court's sole apparent objection to the Pennsylvania instructional materials and equipment program was to the form of the program.

> Although textbooks are lent only to students, Act 195 authorizes the loan of instructional material and equipment directly to qualifying nonpublic elementary and secondary schools in the Commonwealth.

*Meek, supra,* 421 U.S. at 362–63, 95 S.Ct. at 1762.[2] *See also Roemer v. Board of Public Works of Maryland,* —— U.S. ——, ——, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976). The Ohio statute authorizes, in an attempt to meet the constitutional objections articulated in *Meek,* the lending of such materials and equipment not to the nonpublic schools, but only to nonpublic schoolchildren or to their parents.

Plaintiffs argue, understandably, that an unconstitutional program conferring benefits directly upon the nonpublic school cannot be rendered constitutional merely by conferring those same benefits directly

**2.** The Supreme Court in *Meek, supra,* 421 U.S. at 361, 95 S.Ct. 1753, n. 10 did note that, prior to the commencement of the New York and Pennsylvania textbook programs upheld in *Meek* and in *Allen,* the parents of nonpublic schoolchildren purchased their own textbooks. The evidence presently before this Court does not indicate whether or not parents of Ohio's nonpublic schoolchildren purchased the textbooks for their children prior to the initiation of either the textbook or instructional materials and equipment programs, which were first instituted in Ohio nine years ago.

It remains unclear, however, whether this fact is determinative in an Establishment Clause inquiry:

> Here [federal legislation] is challenged on the ground that its primary effect is to aid the religious purposes of church-related colleges and universities. Construction grants surely aid these institutions in the sense that the construction of buildings will assist them to perform their various functions. *But bus transportation, textbooks, and tax exemptions all gave aid in the sense that religious bodies would otherwise have been forced to find other sources from which to finance these services.* Yet all of these forms of governmental assistance have been upheld. *Tilton v. Richardson,* 403 U.S. 672, 679, 91 S.Ct. 2091, 2096, 29 L.Ed.2d 790 (1971) [emphasis supplied].

upon the pupils of that school. *See Committee for Public Education and Religious Liberty v. Nyquist, supra,* 413 U.S. 756, 781, 93 S.Ct. 2955, 37 L.Ed.2d 948. Indeed, the Supreme Court itself, in holding the Pennsylvania instructional materials and equipment program unconstitutional on the ground that it had the impermissible primary effect of advancing religion, cited for support *Sloan v. Lemon,* 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973), which held invalid on the same ground a parent tuition reimbursement plan. *Meek, supra,* 421 U.S. at 364, 95 S.Ct. 1753. Of course, both *Nyquist* and *Sloan* may be distinguished from the present case in that the monetary aid at issue in those cases was, absent excessive governmental entanglement with religion, incapable of restriction to purely secular usage.

In portions of its opinion in *Meek,* the Supreme Court seems to indicate that all aid flowing to the core educational functions of the nonpublic school is impermissible.[3] Nonetheless, the Supreme Court in *Meek* reaffirms state aid in the form of textbooks—undeniably an integral part of any nonpublic school's core educational functions. Further, this Court is unable to determine a substantive difference between textbooks on the one hand and maps, charts, models and collections on the other, except, possibly, the relative effectiveness of the latter in attracting the attention of a particular student and in educating him.[4] In the view of this Court, however, the determination of pedagogical effectiveness is better left to educators than to the courts.

The Supreme Court has recognized that the education provided by nonpublic church-related schools is in part secular and in part sectarian, and that "some forms of aid may be channeled to the secular without providing direct aid to the sectarian." *Committee for Public Education and Religious Liberty v. Nyquist, supra,* 413 U.S. at 775, 93 S.Ct. at 2967. The educational materials and equipment provided by § 3317.06 O.R.C. are, like textbooks, inherently secular and incapable of diversion to religious use. Further, the administrative involvement required by the statute of public personnel implementing the program is purely clerical and requires no more surveillance over or entanglement with the religious functions of the nonpublic school than does the involvement required of public personnel implementing the textbook programs upheld in *Allen* and in *Meek.* Since the nature of the clerical duties envisioned by the statute is not such as would render the personnel involved susceptible to religious influence, there is no danger that the state will become excessively involved in the religious character of the nonpublic institution.

In the view of this Court, then, the Ohio instructional materials and equipment program differs neither in form nor in substance from the textbook programs previously found by the United States Supreme Court to be constitutional.

## C. Diagnostic and Health Services

Section 3317.06(D), (E) and (F) authorizes the provision of such services as speech and hearing diagnosis, physician, nursing, dental and optometric services and psychological diagnosis, to take place in the nonpublic schools. The statute further authorizes the local public school districts to contract with the state department of public health in order to provide such services to the pupils attending the nonpublic schools. The parties have stipulated that the purpose of these services is to determine if nonpublic

---

**3.** It is, of course, true that as a part of general legislation made available to all students, a State may include church-related schools in programs providing bus transportation, school lunches, and public health facilities—secular and nonideological services unrelated to the primary, religion-oriented educational function of the sectarian school. The indirect and incidental benefits to church-related schools from those programs do not offend the constitutional prohibition against establishment of religion.

*Meek, supra,* 421 U.S. at 364, 95 S.Ct. at 1763.

**4.** The Court notes that, under the statute, instructional materials and equipment may be stored on the nonpublic premises. This fact, however, was not determinative in either *Allen* or *Meek. See Meek v. Pittenger,* 421 U.S. at 361 n. 9, 95 S.Ct. 1753.

pupils are deficient or in need of assistance in these areas.

Administratively, nonpublic school personnel will participate in the program only insofar as their cooperation is necessary to schedule, provide space and, in some instances, identify children in need of such diagnostic services. The personnel actually providing the diagnostic and health services, however, are employed by the public board of education, are under its control, and subject to periodic inspection by their supervisors solely for determination as to whether the service personnel are engaged in the proper performance of their diagnosis of health problems.

The Supreme Court in *Meek v. Pittenger, supra,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217, held that Pennsylvania's auxiliary services act, which provided on the nonpublic premises remedial and accelerated instruction, guidance counseling and testing, and speech and hearing services, violated the Establishment Clause since excessive entanglement would be required for the state to assure that the professional staff members providing such services do not advance the religious mission of the nonpublic school. The Court did not hold, however, that such programs may never be extended to nonpublic schoolchildren:

> The appellants do not challenge, *and we do not question,* the authority of the Pennsylvania General Assembly to make free auxiliary services available to all students in the Commonwealth, including those who attend church-related schools.

*Meek v. Pittenger, supra,* 421 U.S. at 368 n.17, 95 S.Ct. at 1764 [emphasis supplied].[5] The Court focused upon the academic functions of the remedial services provided in the Pennsylvania statute, and found that the personnel providing the auxiliary services were, for the most part, teachers. 421 U.S. at 370, 95 S.Ct. 1753. Because the services in that case were to be provided on

the nonpublic school premises, the Court found that the program was constitutionally indistinguishable from those found to be unconstitutional in *Lemon v. Kurtzman, supra,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745.

Accordingly, § 3317.06 O.R.C. distinguishes diagnostic and health services that are concerned with the detection of health problems on the one hand, and treatment services that are concerned with the remedy of those problems on the other. The former are provided, pursuant to the statute, on the nonpublic school premises, but the latter are not.

*1. Physician, nursing, dental and optometric services.* The plaintiffs in this action do not challenge this provision, and the Supreme Court has repeatedly stated that the states may constitutionally provide public health and welfare benefits to all of their young citizens, whether they attend public or nonpublic schools. *Meek v. Pittenger, supra,* 421 U.S. at 371 n.21, 95 S.Ct. 1753; *Lemon v. Kurtzman, supra,* 403 U.S. at 616–17, 91 S.Ct. 2105. This Court is of the opinion that the provision of these narrow health programs on the premises of the nonpublic school neither has the primary effect of advancing the religious mission of those schools nor involves the personnel providing such services in an excessively entangling relationship with those schools.

*2. Speech and hearing diagnosis.* The Supreme Court in *Meek* held Pennsylvania's auxiliary services act unconstitutional in its entirety, but indicated that it would have upheld the constitutionality of certain of the provisions of that act had severance been appropriate:

> [The Act's] authorization of "speech and hearing services," at least to the extent such services are diagnostic, seems to fall within that class of general welfare services for children that may be provided by the State regardless of the incidental

---

5. *But see Meek v. Pittenger,* 421 U.S. at 369, 95 S.Ct. at 1765.

We need not decide whether substantial state expenditures to enrich the curricula of church-related elementary and secondary schools, like the expenditure of state funds to support the basic educational program of those schools, necessarily result in the direct and substantial advancement of religious activity.

benefit that accrues to church-related schools.

421 U.S. at 371 n.21, 95 S.Ct. at 1766.

In their stipulations, the parties describe the functions of the speech and hearing diagnostic staff to include identification of those children suffering speech and hearing handicaps and referral of such children to therapists for treatment. The duties of these specialists include cooperation with medical personnel in developing an appropriate program for each such handicapped child.

The plaintiffs challenge this provision on the grounds that speech and hearing diagnostic services, like the remedial services found to be unconstitutional in *Meek*, provide no guarantee that religious doctrine will not become intertwined with secular services. Plaintiffs apparently believe that this conclusion necessarily results from the personal communication that must take place between the diagnostic speech and hearing specialist and the nonpublic school child.

While this Court agrees with plaintiffs that communication must almost inevitably take place when a child's speech and hearing abilities are tested, this Court disagrees with plaintiffs that such communication presents the dangers envisioned by them. To say that health services—which the Supreme Court has consistently held to be within the realm of permissible state aid—must be conducted in silence in order to meet all constitutional objections strikes this Court as beyond the reach of reason. Plaintiffs make no challenge to the provision of medical, dental, nursing or orthopedic services to pupils attending nonpublic schools, yet oral communication between those persons providing such services and the nonpublic pupil takes place just as certainly as it takes place during the process of speech and hearing diagnosis.

This Court is therefore of the opinion that the statute is constitutional insofar as it authorizes the provision of speech and hearing diagnosis to take place on the premises of the nonpublic school.

3. *Diagnostic psychological services.* The functions of the diagnostic psychological staff include identification through recognized professional methods of children suffering from psychological problems, and referral of children requiring treatment to the therapeutic psychological staff for treatment off the premises of the nonpublic school. Plaintiffs challenge this program, arguing that such services give rise to at least the same objections as did the remedial programs held unconstitutional in *Meek*.

It is, no doubt, true that psychological diagnosis may involve an element of subjectivity not necessarily involved in speech and hearing diagnosis or in other medical services, yet this Court perceives a significant distinction between psychological diagnosis and psychological treatment. Psychological treatment would ideally involve an ongoing relationship with the particular child and would attempt to deal with the child in the context of his entire environment, including his educational environment, thus giving rise to the dangers articulated in *Meek*. Psychological diagnosis, on the other hand, requires only relatively limited contact with the child, and the procedures employed during such contact are more easily governed by objective and professional testing methods directed, not toward the ultimate rehabilitation of the child, but toward isolating professionally recognized symptoms.

The Supreme Court in *Meek* addressed itself to the problems raised by the presence of personnel whose functions were perceived to be essentially pedagogical. The danger arising from the presence of teachers in the nonpublic environment stems from the nature of the functions performed by those teachers:

> In terms of potential for involving some aspect of faith or morals in secular subjects, a textbook's content is ascertainable, but a teacher's handling of a subject is not.

*Lemon v. Kurtzman, supra,* 403 U.S. at 617, 91 S.Ct. at 2113. Diagnostic services differ markedly from teaching services in that the ongoing and at times unpredictable communication between the pupil and the teacher

is not present in the diagnostic process directed toward the isolation of particular professionally recognized symptoms of physical or mental difficulties present in a child.

Accordingly, in the view of this Court, the primary beneficiaries of such programs are the children attending the nonpublic schools and the objections perceived by the Supreme Court in *Meek* as presented by the remedial programs authorized by the Pennsylvania legislation are not presented by Ohio's programs authorizing only narrow forms of health diagnosis and services. Such programs do not present the necessity for entangling supervision of the personnel providing the services since, by virtue of the nature of such services, there exists no real likelihood that the professional staff providing such services will advance the religious mission of the schools in which they serve.

### D. Therapeutic and Remedial Services

Section 3317.06(G), (H), (I) and (K) O.R.C. authorizes the provision of therapeutic psychological, speech and hearing services, guidance and counseling services, remedial services and programs for deaf, blind, emotionally disturbed, crippled and physically handicapped children attending nonpublic schools. Such services are to be provided off the nonpublic school premises and in public schools, public centers or in mobile units, as determined by the state department of education. Further, personnel providing such services would be employees of the local board of education or under contract with the state department of health. According to the stipulations of the parties, the determination of the precise location of such services would depend upon such factors as distance, transportation safety and adequacy of accommodations in public schools and centers. Finally, the statute authorizes transportation to public schools or centers when necessary.

The stipulations define "public center" to include libraries, public meeting halls, firehouses, or recreation centers. It is further

expected that when such services are provided in mobile units parked off nonpublic school premises, pupils requiring the services authorized by the statute will be treated on an individual basis or with a small group of students having similar problems.

Nonpublic school personnel will be involved in the operation of the programs only insofar as it is necessary to coordinate scheduling and, in some instances, to identify the children in need of such specialized services.

The Supreme Court in *Meek* characterized the nature of the duties of the professionals administering these remedial and rehabilitative services to nonpublic schoolchildren as essentially pedagogical and therefore susceptible to religious influence when conducted in the nonpublic schools. Section 3317.06 O.R.C. therefore authorizes the provision of these remedial services to nonpublic schoolchildren only off the premises of the nonpublic schools.

Plaintiffs argue that this section of the statute fails to meet the constitutional test of validity in that, although the statute requires that the services be provided off the nonpublic premises, there is no assurance that either the public centers or the mobile units will be truly disassociated from the nonpublic schools. Plaintiffs envision creation of "public centers" in name only but in reality created and conducted solely for the benefit of a parochial constituency.

As this Court views the legislative program, the statute authorizes the provision of remedial and therapeutic services within the public schools—presumably the same physical location of similar services provided to public schoolchildren. However, recognizing that the physical logistics of transporting and servicing nonpublic schoolchildren may, in some instances, preclude the provision of those services in the public schools, the General Assembly has, wisely, given to the state department of education the flexibility necessary in making these services available to all nonpublic schoolchildren under all circumstances. Yet the clear import of the statute on its face is

that such services are to take place on sites neither physically nor educationally identified with the functions of the nonpublic school. Just as the statute provides no authorization for the construction of buildings, the statute on its face provides no authority for the creation of centers or mobile units public in name and financing but private in every other substantive respect.

Plaintiffs further argue that because it is anticipated that mobile units will serve only nonpublic schoolchildren when so assigned and because public centers could conceivably be made available to nonpublic schoolchildren for purposes different from those for which the center is made available to public schoolchildren, a direct aid to religion is the necessary result of the operation of the statute. In this argument plaintiffs are splitting a very fine hair.

In the view of this Court, a requirement that the facilities in which remedial and therapeutic services are provided to nonpublic schoolchildren must remain—both formally as well as substantively—public facilities, does not require that those facilities be used at all times and under all circumstances in precisely the same manner with respect to both public and nonpublic schoolchildren. Most public school pupils are provided remedial and therapeutic services by the state in the school which they attend. Once it is recognized, which it must be, that the public schools may not under all circumstances be available to nonpublic schoolchildren for remedial and therapeutic services, it must be recognized that if nonpublic schoolchildren are to receive such services at all, those services will under some circumstances be made available to them in a manner not precisely identical to that in which public schoolchildren receive such services.[6]

The Court also notes that, according to the stipulations of the parties, it is anticipated that personnel providing therapeutic and remedial services will, under some cir-

cumstances, be required to deal with the child's regular classroom teachers. Such an arrangement raises, at first glance, the specter of entanglement that could prove fatal to the programs. However, because the services are to be provided outside the nonpublic school, it cannot be said that the religious atmosphere of the nonpublic school will foster the risk of even unconscious injection of religion into the services found to be objectionable in *Meek*. Thus there exists no need for entangling supervision in order to ensure that the remedial and therapeutic personnel do not advance the religious mission of the schools attended by the nonpublic schoolchildren served.

Further, and perhaps more importantly, if any such remedial and therapeutic service is ever to be effective, it should ideally serve the child in the context of his total environment, including his educational environment. Thus, to say that such services are unconstitutional because the personnel providing such services must encounter the child's nonpublic school teacher is to say that nonpublic schoolchildren may never receive effective state supported remedial and therapeutic services.

The Supreme Court in *Meek* did not question the state's authority to provide such aid to its young citizens, but found objectionable only the mechanics of the Pennsylvania statute, whereby the services were to be provided in the nonpublic school. Ohio's statute removes those services from the nonpublic school's "atmosphere dedicated to the advancement of religious belief" and this Court concludes that Ohio's remedial and therapeutic programs meet the constitutional objections articulated in *Meek*. The primary beneficiaries of the programs are unquestionably the children who are in need of such services and the administration of the program is not likely to foster an excessive governmental entanglement with the nonpublic schools attended by those children.

---

6. In *Wheeler v. Barrera,* 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974), the Supreme Court seemed to imply by way of dictum that states may provide to nonpublic schoolchildren services that are comparable, although not identical, to those provided to public schoolchildren.

### E. Standardized Testing and Scoring Services

Section 3317.06(J) O.R.C. authorizes the local school districts throughout the State of Ohio to supply for use by nonpublic schoolchildren within the district such standardized tests and scoring services as are in use in the public schools of the state. Such tests, according to the stipulations provided by the parties, are used to measure the progress of all students in secular subjects.

The Supreme Court in *Levitt v. Committee for Public Education,* 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973), held unconstitutional a New York statute authorizing reimbursement to nonpublic schools for such state mandated services as the maintenance of a regular program of traditional internal testing. The Court, through Mr. Chief Justice Burger, perceived in the program the risk that "these examinations, *prepared by teachers under the authority of religious institutions,* will be drafted with an eye, unconsciously or otherwise, to inculcate students in the religious precepts of the sponsoring church." 413 U.S. at 480, 93 S.Ct. at 2819 [emphasis supplied].[7]

Unlike the testing program invalidated in *Levitt,* the program authorized by the Ohio statute does not involve tests prepared by nonpublic school teachers, and therefore cannot result in the danger of inadvertent religious indoctrination. Rather, the Ohio statute authorizes the provision of only those same tests and scoring services as are provided in the public schools of the local district. The content of such tests, then, is necessarily and without further precaution restricted to the secular content of the state-required secular courses taught in the nonpublic schools. Since nonpublic school personnel are involved in neither the substantive drafting of the tests nor in the scoring of those tests, there is no possibility of inadvertent injection of religious doctrine in the administration of the tests. Likewise, because nonpublic school personnel will be involved only ministerially in the administration of the tests, the program will not foster an excessive entangling relationship between the state and the church-related school.

This Court is therefore of the opinion that the testing and scoring services authorized by the statute are constitutional.

### F. Field Trip Transportation

Section 3317.06(L) O.R.C. authorizes the local public school districts to provide to nonpublic schoolchildren such field trip transportation and services as are provided to public school students within the district. The statute further authorizes the local school districts to contract with commercial transportation companies for the service if school district buses are unavailable. The stipulations of the parties indicate that, under the statute, transportation would be provided for student visits to governmental, industrial, cultural and scientific centers designed to enrich the secular studies of nonpublic schoolchildren.

Plaintiffs argue that to the extent that field trip transportation relates to specific aspects of the parochial school's educational programs, the program cannot withstand constitutional scrutiny.

The Supreme Court in *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), upheld a New Jersey statute providing bus transportation to nonpublic schoolchildren, although the Court recognized that the state's provision of such services may have facilitated attendance at nonpublic schools. 330 U.S. at 17, 67 S.Ct. 504. The incidental benefit to the nonpublic schools was thought in that case not to render the program unconstitutional. This Court is unable to distinguish in a significant manner the constitutional provision to nonpublic schoolchildren of bus transportation on a daily basis from the provision of transportation on an occasional basis. Both may be seen to confer an indirect benefit upon the nonpublic school in the sense that the statute may render attendance at the

---

7. The Court in *Levitt* also noted that the New York statute provided direct money grants to nonpublic schools, yet provided no means of assuring that the money would not be used for sectarian, as opposed to secular, purposes. 413 U.S. at 477, 93 S.Ct. 2814.

nonpublic school somewhat more attractive to certain parents, but that indirect benefit upon the nonpublic school was not held to be determinative of the constitutionality of such programs in *Everson.*

Further, the administrative entanglement between public and nonpublic personnel would not be significantly greater under the Ohio field trip program than under the program upheld in *Everson,* since only simple scheduling of the transportation services would be required. Because the statute specifically authorizes the local public schools to contract for transportation services where necessary to accommodate all scheduled field trips, this Court can perceive no danger that scheduling conflicts would pressure the public schools into subordinating their program schedules to accommodate those of the nonpublic schools.

This Court therefore concludes that the field trip transportation program authorized by § 3317.06(L) O.R.C. is constitutional.

V

This Court concludes that § 3317.06 O.R.C. is on its face constitutional. The principal or primary effect of the statute is to make available to all students within the State of Ohio, both public and nonpublic, certain limited and inherently secular services and materials. Likewise, this Court does not believe that the statute will foster excessive governmental entanglement, either administrative or political. The amount of aid appropriated by the Ohio General Assembly to effectuate all of the programs authorized by § 3317.06 O.R.C. is substantial, averaging approximately $176.00 per nonpublic pupil per year. But because this Court can perceive no substantive constitutional objection to either the nature or the form of the programs authorized, this Court can perceive no constitutionally significant distinction between a little bit of secular aid and a lot of secular aid. The statute authorizes no transfer of money to the nonpublic schools and the guidelines promulgated for the implementation of the programs provide that funds unencumbered and unexpended for the authorized purposes at the close of the second year of the biennium are to be returned to the state treasurer. Surely, if the quality of the aid extended by the state to its citizens presents no constitutional objection, then the quantity of that aid must be likewise unobjectionable.

Finally, although the programs authorized by the statute are dependent upon periodic appropriations, it is the conclusion of this Court that the potentially divisive political effect of the programs is minimal. The statute on its face provides services and materials to students attending nonpublic schools only to the extent that those services and materials are already available to children attending public schools. Additionally, the services and materials provided to students in nonpublic schools cannot exceed in cost or quality the services provided to students attending public schools. Therefore, this statute merely extends already existing programs to all students in Ohio. Since the services and materials provided under the statute may not exceed in cost or quality those provided to public schoolchildren, any political debate would, in the view of this Court, most likely relate to the need for and the merits of providing such services and materials to pupils in general rather than to those attending nonpublic schools in particular.