Stuart J. FILLER and Nassau County Chapter of New York Civil Liberties Union, Plaintiffs,

v.

PORT WASHINGTON UNION FREE SCHOOL DISTRICT, Commissioner of Education of the State of New York, Comptroller of the State of New York and Attorney General of the State of New York, Defendants.

No. 76 C 2196.

United States District Court, E. D. New York.

Sept. 16, 1977.

As Amended Oct. 25, 1977.

Marvin Zevin and Rona Seider, Mineola, N.Y., for plaintiffs.

Bertram B. Daiker, Port Washington, N.Y., for defendant Pt. Washington School Dist.

Louis J. Lefkowitz, Atty. Gen. of State of New York, Jean M. Coon, Asst. Sol. Gen., Albany, N.Y., for State of New York.

## MEMORANDUM AND ORDER

GEORGE C. PRATT, District Judge.

Section 912 of New York's Education Law requires a public school district, upon request of the authorities of a non-public school, to provide to the district's resident children who attend the non-public school, all of the health and welfare services which are made available to the district's public school children:

> The voters and/or trustees or board of education of every school district shall, upon request of the authorities of a school other than public, provide resident children who attend such school with any or all of the health and welfare services and facilities which are made available by such voters and/or trustees or board of education to or for children attending the

public schools of the district. Such services may include, but are not limited to all services performed by a physician, dentist, dental hygienist, nurse, school psychologist, school social worker or school speech correctionist, and may also include dental prophylaxis, vision and hearing tests, the taking of medical histories and the administration of health screening tests, the maintenance of cumulative health records and the administration of emergency care programs for ill or injured pupils. Any such services or facilities shall be so provided notwithstanding any provision of any charter or other provision of law inconsistent herewith. Where children residing in one school district attend a school other than public located in another school district, the school authorities of the district of residence shall contract with the school authorities of the district where such nonpublic school is located, for the provision of such health and welfare services and facilities to such children by the school district where such nonpublic school is located, for a consideration to be agreed upon between the school authorities of such districts, subject to the approval of the qualified voters of the district of residence when required under the provisions of this chapter. Every such contract shall be in writing and in the form prescribed by the commissioner of education, and before such contract is executed the same shall be submitted for approval to the superintendent of schools having jurisdiction over such district of residence and such contract shall not become effective until approved by such superintendent.

Plaintiffs attack the statute both on its face and as applied in the Port Washington School District on the ground that it offends the establishment of religion clause of the first amendment of the constitution of the United States.

■ Several motions are pending, only one of which merits extended discussion and analysis. All of the "state defendants" (the Commissioner of Education, the Comptroller, and the Attorney General of the State of New York) have moved to strike the complaint for failure to comply with FRCP 11 which requires a pleading to be signed by at least one attorney of record and further requires his address to be stated. The filed complaint here has been signed in compliance with FRCP 11. Although the attorneys' address is not set forth in the typewritten portion of the complaint, it is set forth on the blue back. Unquestionably, the desirable practice is to set forth the attorney's address at the foot of the complaint immediately below the signature of the attorney. Plaintiffs' attorneys' failure to comply with that practice in this instance, however, does not appear to be a wilful disregard or circumvention of FRCP 11. Nor does it appear to have caused counsel for the state defendants any confusion since their motion papers are directed to plaintiff's attorneys at their proper address. Dismissal of the complaint, therefore, is not warranted, and this portion of the state defendants' motion is denied.

■ Defendant Comptroller and defendant Attorney General also move to dismiss the complaint as against them on the ground that they are not proper parties to this action. The motion is granted. As to the Comptroller, while state funds are disbursed to school districts in New York, including defendant Port Washington district, the basis for disbursal is not directly related to the subject matter of this action, and plaintiffs have neither alleged facts nor brought to the court's attention any statutes which would warrant the granting of specific relief against the Comptroller in this action.

■ The connection of the Attorney General to this action is even more remote. Of course, the Attorney General is entitled to notice of the pendency of any action challenging the constitutionality of a state statute. NYCPLR 1012(b). But that does not make him a party to the action; it merely alerts him to the claim and leaves him with several options. In this case, the Commissioner of Education, a state officer, is a defendant, and a proper one, and the

Attorney General has appeared as his counsel. No more direct involvement of the Attorney General in the case than as attorney for defendant Commissioner is appropriate.

The third and more difficult motion is plaintiff's motion for a preliminary injunction granting essentially the same relief as is sought by the action itself. Upon oral argument, all parties and the court agreed that the action was an appropriate one for advancement and consolidation of the preliminary injunction motion with a trial on the merits pursuant to FRCP 65(a)(2).

At the time of argument of the preliminary injunction motion in February there was pending in the United States Supreme Court the case of *Wolman v. Walter* on appeal from the United States District Court for the Southern District of Ohio, 417 F.Supp. 1113. That case presented a challenge to a state statute (Ohio) which authorized public financing of various types of services to non public school children, most of whom attended sectarian schools. Decision of this motion was therefore withheld pending determination of *Wolman.* On June 24, 1977, the Supreme Court rendered its judgment together with five separate opinions; in addition, two judges noted certain concurrences and dissenting views without separate opinions. —— U.S. ——, 97 S.Ct. 2593, 53 L.Ed.2d 714.

■ In light of the majority holdings in *Wolman* it is apparent that most, and perhaps all, of the health and welfare services contemplated by N.Y. Education Law § 912 may constitutionally be supplied to parochial * school pupils at taxpayer expense without violating the establishment clause of the first amendment. Some questions remain, however, as to whether certain of those services may constitutionally be supplied in the parochial schools themselves, and as to the scope and proper place of performance of the services which are in fact being supplied by the Port Washington

School District under this statute. Before an appropriate injunction can be fashioned as a final judgment, therefore, additional facts must be supplied to the court either by way of hearing or stipulation.

### The Challenged Statute

Any discussion of the tension between the establishment clause and the demonstrated desire of New York State to grant some financial assistance to its parochial school pupils might well begin with the following observations by Mr. Justice Powell in his separate opinion in *Wolman.*

Our decisions in this troubling area draw lines that often must seem arbitrary. No doubt we could achieve greater analytical tidiness if we were to accept the broadest implications of the observation in *Meek v. Pittenger,* 421 U.S. 349, 366, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), that "[s]ubstantial aid to the educational function of [sectarian] schools * * * necessarily results in aid to the sectarian enterprise as a whole." If we took that course, it would become impossible to sustain state aid of any kind—even if the aid is wholly secular in character and is supplied to the pupils rather than the institutions. *Meek* itself would have to be overruled, along with *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), and even perhaps *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). The persistent desire of a number of States to find proper means of helping sectarian education to survive would be doomed. This Court has not yet thought that such a harsh result is required by the Establishment Clause. Certainly few would consider it in the public interest. Parochial schools, quite apart from their sectarian purpose, have provided an educational alternative for millions of young Americans; they often afford wholesome competition with our public schools; and in some States they relieve substantially

---

* "Non public school" is the statutory term. The first amendment question arises when the non public school is a church-related institution. For convenience and clarity, therefore, the remainder of the decision will use the term "parochial schools" to refer to the church-related, non public schools who present constitutional problems under § 912.

the tax burden incident to the operation of public schools. The State has, moreover, a legitimate interest in facilitating education of the highest quality for all children within its boundaries, whatever school their parents have chosen for them.

It is important to keep these issues in perspective. At this point in the 20th century we are quite far removed from the dangers that prompted the Framers to include the Establishment Clause in the Bill of Rights. See *Walz v. Tax Commission*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). The risk of significant religious or denominational control over our democratic processes—or even of deep political division along religious lines—is remote, and when viewed against the positive contributions of sectarian schools, any such risk seems entirely tolerable in light of the continuing oversight of this Court. Our decisions have sought to establish principles that preserve the cherished safeguard of the Establishment Clause without resort to blind absolutism. If this endeavor means a loss of some analytical tidiness, then that too is entirely tolerable. —— U.S. at ——–——, 97 S.Ct. at 2613.

New York State's deep concern that its school children receive health and welfare services is expressed both in its constitution and statutes.

Article VII, § 8, subd. 2 of the New York State Constitution provides in part:

Subject to the limitations on indebtedness and taxation, nothing in this constitution contained shall prevent the legislature from providing * * * for health and welfare services for all children, either directly or through subdivisions of the state, including school districts.

By chapter 731 of its Laws of 1939 the New York legislature authorized a broad program of health and welfare services for children attending "schools other than public". By simultaneous and parallel amendments to the education law, the public health law, and the public welfare [now social services] law the legislature granted power to school authorities, public health authorities, and all commissioners of public welfare, respectively, to provide parochial school children with

all or any of the health and welfare services and facilities, including but not limited to health, surgical, medical, dental, and therapeutic care and treatment, and corrective aids and appliances, authorized by law and now granted or hereafter made available for or to children in the public schools in so far as these services and facilities may be requested by the authorities of the schools other than public.

Two years later, by chapter 936 of the Laws of 1941, the legislature made mandatory what previously had been discretionary. The earlier language in each statute, "shall have the power to provide" health and welfare services, was reduced by eliminating "have the power to" so that the appropriate public officials were required to provide to parochial school children the same health and welfare services provided to public school students, subject only to a request therefor by the parochial school authorities.

In that modified form the public health law and social welfare law provisions have continued to date as sections 2501 and 396 of the respective statutes. The education law provision, now § 912, has been modified. Chapter 650 of the Laws of 1953 amended § 912 by adding certain language designed to deal with the administrative and financing problems caused by a child attending a non public school outside the school district of its residence.

Then in 1974, the legislature restructured § 912 by redefining the health and welfare services and facilities which were required to be made available. The prior description had included "health, surgical, medical, dental and therapeutic care and treatment, and corrective aids and appliances". Under chapter 794 of the Laws of 1974 the included services were described as

all services performed by a physician, dentist, dental hygienist, nurse, school

psychologist, school social worker or school speech correctionist, and may also include dental prophylaxis, vision and hearing tests, the taking of medical histories and the administration of health screening tests, the maintenance of cumulative health records and the administration of emergency care programs for ill or injured pupils.**

### The Parties' Claims

Plaintiffs attack § 912 as if it sprang into being with this 1974 amendment. Their arguments are directed not to the specific changes enacted by chapter 794 of the Laws of 1974 but to the overall concept of tax moneys being used to supply any health or welfare services to children who attend parochial schools.

The broad thrust of plaintiffs' attack is underscored by the sparse factual picture presented by the papers in support of their motion for a preliminary injunction. Indeed, the only specific information before the court as to the scope of the health and welfare services actually being supplied by the Port Washington School District under § 912 and as to the manner in which they are being supplied, comes from the paper subscribed by Thomas J. Ford as attorney for the intervenors and described as "Motion to Intervene as Defendants", and from the memorandum of law of the intervenor-defendants. Those papers were submitted on behalf of 10 families who reside in the Port Washington Union Free School District and have 19 children enrolled in St. Peter of Alcantara Roman Catholic Elementary School. They claimed that all of the children are handicapped and have special needs, part of which are met through the aid of a school nurse, a psychologist, a speech therapist, and doctors who are furnished by the defendant Port Washington School District pursuant to § 912.

More specifically, the intervenors assert that defendant school district supplies their parochial school with the following program of services:

One school nurse—coverage equivalent to three full days per week.

One psychologist—coverage equivalent to one and one-half day per week.

Two doctors—twice a year for students in grades 3 to 7; and once a year for students in grades K–1.

One speech therapist—one and one-half day coverage per week.

The arguments of the parties are cast, of course, in terms of the analysis to be found in the pre-*Wolman* decisions of the United States Supreme Court. Relying primarily on *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1946); *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); and *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), plaintiffs argue that all of the services authorized by § 912 are unconstitutional because their primary effect is the advancement of religion and they excessively entangle government with religion.

Defendants and the intervenors stress the health and welfare nature of the authorized services, claiming that they are not "educational" in nature and therefore do not violate the establishment clause.

Some potential issues can be quickly eliminated. There is no claim of discrimination for § 912 clearly contemplates services which are to be provided equally to all children whether they attend public or non public schools. Moreover, direct aid to parochial schools is not contemplated, nor is the use of any employees of the parochial schools.

### Wolman v. Walters

Merely from the fact that there were five separate opinions and two justices refused to join in any of those opinions, it is apparent that different constitutional premises and analytical approaches were applied by the Supreme Court in arriving at its June

** No parallel amendments were made to the comparable provisions of the public health law and the social welfare law.

24, 1977 judgment. Notwithstanding the diverse views, in its actual holdings, the Supreme Court split with a relatively solid six to three vote.

As to those parts of the Ohio statute which authorized public funds for textbook loans (Part III of the Blackmun opinion); standardized tests and scoring services (Part IV); speech, hearing, and psychological diagnostic services (Part V); and remedial services, guidance and counselling services, as well as therapeutic psychological and speech and hearing services when provided off the non public school premises (Part VI); the Court agreed by vote of at least six to three that the statute did not offend the first amendment. As to loans of instructional materials and equipment (Part VII) and field trip transportation and services (Part VIII), the court found the statute invalid, voting six to three on the former, and five to four on the latter.

Because they significantly extend the establishment clause mode of analysis for health and welfare services, the criteria expounded in Justice Blackmun's opinion must now be used to determine the constitutional validity of N.Y. Education Law § 912 as last amended in 1974. In Part II of his *Wolman* opinion Justice Blackmun noted:

> The mode of analysis for Establishment Clause questions is defined by the three-part test that has emerged from the Court's decisions. In order to pass muster, a statute must have a secular legislative purpose, must have a principal or primary effect that neither advances nor inhibits religion, and must not foster an excessive government entanglement with religion. —— U.S. at ——, 97 S.Ct. at 2599.

As suggested in that opinion, when dealing with services of the health and welfare type, there is no difficulty with the first part of the test, secular legislative purpose. Problems do arise, however, in determining the "effect" and "excessive entanglement" criteria. Dealing with services such as are contemplated by § 912, the majority opinion in *Wolman* drew a distinction between, on the one hand, "therapeutic, guidance, and remedial services", which might be provided at public expense to parochial school students only when they were performed off the non public school premises, and, on the other hand, "diagnostic services" which could be provided to parochial school students even within the parochial school building itself. The Court found a common thread in its decisions "to the effect that the provision of health services to all school children—public and non public—does not have the primary effect of aiding religion". —— U.S. at ——, 97 S.Ct. at 2602.

Justice Blackmun pointed out that no challenge was raised in *Wolman* to subsection (E) of the statute which authorized the provision of "physician, nursing, dental and optometric services" to parochial school pupils. Viewing those services as being clearly constitutional, he concluded with respect to the "diagnostic services":

> We perceive no basis for drawing a different conclusion with respect to diagnostic speech and hearing services and diagnostic psychological services. —— U.S. at ——, 97 S.Ct. at 2602.

The "therapeutic services" which the Supreme Court held could be provided to parochial school students only "at a neutral site off the premises of the non public schools", were described in the Ohio statute as including "therapeutic psychological and speech and hearing services", "guidance and counseling services", "remedial services", and "programs for the deaf, blind, emotionally disturbed, crippled, and physically handicapped children". The danger to be avoided, according to the Supreme Court, was that a relationship between "therapist" and pupil might provide opportunities to transmit ideological views. But, *Meek v. Pettinger, supra,* 421 U.S. at 371, 95 S.Ct. at 1766, stressed that "this danger arose from the fact that the services were performed in the pervasively sectarian atmosphere of the church-related school." The Court concluded that if those types of services were to be offered at truly religiously neutral locations, then the danger perceived in *Meek* would not arise. —— U.S. at ——, 97 S.Ct.

2593. Thus, the "therapeutic services" of the Ohio statute in *Wolman,* limited as they were to being provided "in the public school, in public centers, or in mobile units located off the non public premises" were held to be constitutional.

■ In short, *Wolman v. Walter* has added considerable specific content to many of the general principles previously enunciated by the Supreme Court for determining the scope of permissible aid to students attending parochial schools. Within the group of permissible health and welfare services, whether a particular service is "diagnostic" or "therapeutic" determines whether it may be performed on the parochial school premises or only at a religiously neutral site.

### § 912 and the Port Washington School District

■ The task remaining in this case, then, is to determine whether the services authorized by § 912 and provided by the Port Washington School District are constitutional when subjected to the analysis of *Wolman v. Walter* and its ancestors. Some parts of the task can be disposed of easily. The Supreme Court clearly views physician, nursing, and dental services as constitutional even when performed within the parochial school. Thus, the first four classifications of § 912, *i. e.,* services performed by a "physician, dentist, dental hygienist, nurse" would clearly pass constitutional muster.

■ The remaining three professionals whose services are authorized by the statute are "school psychologist, school social worker, or school speech correctionist". Services of the school psychologist and school speech correctionist are constitutional under *Wolman.* To the extent they are "diagnostic", they may be provided on the parochial school premises. To the extent that they may be "therapeutic" or "remedial" and, therefore, raise the potential for "a relationship with the pupil in which there might be opportunities to transmit ideological views", —— U.S. at ——, 97 S.Ct. at 2605, the services must be rendered in a religiously neutral location.

■ Section 912 also refers to services performed by a "school social worker". The record does not indicate whether such a person performs services for the Port Washington School District, nor does § 912 define what is meant by the term "school social worker". Section 7701 of the Education Law defines the practice of a "certified social worker" in terms of social case work, social group work, community organization, and the administration, education, and research connected with social work. The statute further states: "The practice of social work is for the purpose of helping individuals, families, groups, and communities to prevent or to resolve problems caused by social or emotional stress." Assuming that a "school social worker" under § 912 is one who practices in the schools "social work" as referred to in § 7701, it would appear that the services rendered by a "school social worker" could fall into either or both of the "diagnostic"—"therapeutic" categories; some of the services might even cross the line dividing permissible health and welfare services from impermissible transmission of ideological views. Thus, specific determination of where the services of a "school social worker" might fall in the overall picture must await a specific factual pattern, to be developed if appropriate, subsequently in this proceeding. If the Port Washington School District does not have a school social worker, there is a serious question of whether disposition of that issue would be proper in this action.

■ In addition to authorizing health and welfare services when performed by the named professionals, the 1974 amendment to § 912 identifies certain specific services which must also be supplied equally to public and non public school students. All of those specific services appear to fall within the group of health and welfare services which may constitutionally be performed even on the parochial school premises.

1. "Dental prophylaxis" falls within the category "dental services" which in *Wolman* were assumed by all parties, and by

the Court, to be constitutionally permitted even when performed in the parochial school.

2. No danger of transmitting religious instruction or advancing religious beliefs would seem to be involved in such acts as "the taking of medical histories", "the administration of health screening tests", or "the maintenance of cumulative health records".

3. "Vision and hearing tests" similarly may be administered constitutionally even on the parochial school premises. Such tests are diagnostic rather than therapeutic; they create no opportunities to transmit ideological views.

4. Finally, the last category of the statute, "the administration of emergency care programs for ill or injured pupils", is clearly authorized by the Supreme Court's repeated approval of health services to parochial as well as public school students. First aid for an accident or sudden illness calls for only the most basic services of a physician or nurse, involve no temptation to transmit religious instruction, and are clearly permitted in the parochial schools under the Supreme Court's precedents.

In their briefs and on oral argument counsel for both sides understandably focused upon a distinction between "educational" versus "health and welfare" services, since the distinction was then thought to be the touchstone of constitutional validity, particularly in view of the Supreme Court's decision in *Meek v. Pittenger, supra.* Now, however, the Supreme Court in *Wolman* has obviously recognized that a more precise analysis is required for "health and welfare" services. Accordingly, some of the services which might have been classified "educational" under *Meek* were held by *Wolman* to be constitutionally permitted if supplied at a religiously neutral location.

Both sides discuss the decisions of the New York courts in *Greve v. Board of Education,* 36 N.Y.2d 673, 365 N.Y.S.2d 852, 325 N.E.2d 168, *aff'g* 43 A.D.2d 851, 351 N.Y. S.2d 715, wherein an itinerant teacher was provided for assisting deaf children in parochial schools in learning speech and comprehension techniques. In *Greve,* the Court of Appeals affirmed—without opinion, and in the face of a strong dissent on constitutional grounds by Justice Shapiro—a majority of the Appellate Division, Second Department, which had considered the itinerant teacher to be little more than a mechanical device, a "hearing aid" for the deaf children. While Justice Shapiro strongly disagreed with that factual analysis, the majority's interpretation of the service supplied there must control.

Illuminated by *Wolman,* the service which was provided to the parochial school students in *Greve* would now appear to be constitutionally classified in the "therapeutic" category, which, of course, would now require it to be performed at a religiously neutral location.

A similar result may be required with respect to some of the services which the intervenor-defendants assert are being supplied by the Port Washington School District. While there would seem to be little doubt that the services of the school nurse and the two doctors would be constitutionally permitted wherever they were performed, those of the psychologist and speech therapist may well partake both of the nature of "diagnostic" and "therapeutic" services. To the extent that the Port Washington services fall on the "therapeutic" side of the boundary line, they may be constitutionally supplied to parochial school students only at religiously neutral locations. It is likely that, until the Supreme Court's *Wolman* decision, neither the state legislature, nor the Commissioner of Education, nor the Board of Education in the Port Washington School District considered that the place of supplying statutorily mandated health and welfare services had constitutional significance. Thus, it is not surprising that the limited information now before the court prevents definitive analysis of the *Wolman* type.

Now, however, the Supreme Court has clearly indicated that health and welfare services which are "therapeutic" may constitutionally be supplied, but only at a religiously neutral location. Consequently, it is

necessary, in order to determine whether or not specific injunctive relief should be fashioned in this case, to determine what changes, if any, defendant Commissioner and defendant school district have made in the administration of their respective programs for health and welfare services in light of the *Wolman* decision.

If the school district has adapted its program so as to provide its therapeutic and remedial services within the restrictions contemplated by the Supreme Court, then there would appear to be no need for any specific relief now to be granted against the school district. Similarly, with respect to the Commissioner of Education, if he has taken appropriate steps to inform and direct local school districts with respect to the limitations upon the manner in which the health and welfare services required by § 912 may be provided to parochial schools, then the need for further specific relief in this action would cease and the complaint could be dismissed. On the other hand, if either the Commissioner or the school district has failed to take appropriate steps in the light of *Wolman,* then injunctive relief requiring such action may be appropriate.

## CONCLUSION

Since the guidelines established by the Supreme Court for the provision of services of the type described in N.Y. Education Law § 912 have now been well delineated, it may be that the parties can agree as to what further steps, if any, would be appropriate in this litigation. The parties shall attend a status conference to be held at the Long Island Courthouse, 900 Ellison Avenue, Westbury, New York, on September 29, 1977 at 9:00 A.M.

SO ORDERED.