NATIONAL COALITION FOR PUBLIC EDUCATION AND RELIGIOUS LIBERTY et al., Plaintiffs,

v.

Patricia R. HARRIS, Secretary of the United States Department of Health, Education and Welfare, et al., Defendants,

and

James and Bessie Bovis et al., and Philip and Ida Fenster et al., Intervenors-Defendants.

76 Civ. 888 (CHT).

United States District Court, S. D. New York.

April 18, 1980.

See also, D.C., 446 F.Supp. 193.

Leo Pfeffer, New York City, for plaintiffs.

William M. Tendy, U. S. Atty., S.D.N.Y., by Michael H. Dolinger, Asst. U. S. Atty., New York City, for defendants Harris and Boyer.

Allen G. Schwartz, Corp. Counsel of City of New York by Lorna Bade Goodman, New York City, Mary Tucker, Brooklyn, N. Y., for defendant Chancellor of the Board of Education of the City of New York.

Williams & Connolly, by Edward Bennett Williams, Charles H. Wilson, Kevin T. Baine, Stephen L. Urbanczyk, Washington, D. C., for intervenors-defendants Bovis et al.

National Jewish Commission on Law and Public Affairs, by Dennis Rapps, New York City, for intervenors-defendants Fenster et al.

Before VAN GRAAFEILAND, Circuit Judge, and TENNEY and VINCENT L. BRODERICK, District Judges.

## OPINION

TENNEY, District Judge.

The constitutional prohibition against government aid to parochial schools[1] has provoked considerable litigation resulting in an array of not entirely harmonious judicial decisions.[2] This Establishment Clause challenge to Title I of the Elementary and Secondary Education Act of 1965, 79 Stat. 27, as amended, 20 U.S.C. §§ 2701 et seq. ("Title I"), was launched over twenty years ago and, at that time, culminated in the landmark decision of Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The same day that Flast established that a taxpayer had standing to assert this First Amendment claim, the Supreme Court upheld a New York law requiring local public school authorities to lend textbooks free of charge to parochial school students. Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). Confronted with this unfavorable precedent and an apparently unsympathetic Court, the opponents of Title I decided to postpone pursuit of their claim. The legal landscape has now changed and the challenge has been renewed. The National Coalition for Public Education and Religious Liberty ("PEARL") has brought this suit against the Secretary of Health, Education and Welfare, the United States Commissioner of Education, and the Chancellor of the New York City Board of Education to enjoin the allocation and use of Title I funds for the remedial education of parochial school students by public school teachers on the premises of the parochial schools during regular school hours.

Since Flast and Allen were decided, two developments have occurred that are deci-

---

1. Throughout this opinion the term "parochial school" will be used interchangeably with "nonpublic" or "private school." While the latter, of course, may be either secular or sectarian, this opinion is concerned solely with nonpublic schools that are affiliated with a particular religious organization or group. For the sake of brevity, therefore, the religious orientation of a nonpublic or private school will generally be presumed.

2. See Committee for Public Education v. Regan, —— U.S. ——, ——, 100 S.Ct. 840, 855, 63 L.Ed.2d 94 (1980) (Stevens, J., dissenting); Wolman v. Walter, 433 U.S. 229, 251 n. 18, 97 S.Ct. 2593, 2607 n. 18, 53 L.Ed.2d 714 (1977); Wheeler v. Barrera, 417 U.S. 402, 431, 94 S.Ct. 2274, 2290, 41 L.Ed.2d 159 (1974) (Douglas, J., dissenting); Committee for Public Education v. Nyquist, 413 U.S. 756, 761 n. 5, 93 S.Ct. 2955, 2959 n. 5, 37 L.Ed.2d 948 (1973).

sive in the resolution of this lawsuit. First, a series of Supreme Court decisions have clarified in part the precise concerns underlying the First Amendment's prohibition against the establishment of religion. Second, New York City has been running Title I programs for about fourteen years and has accumulated an extensive record of operations that can be examined and evaluated. Upon viewing this record in light of the considerations embodied in the Establishment Clause, this Court has concluded that Title I, as interpreted and applied in New York City, does not violate the First Amendment of the Constitution.

### Procedural Background

After this lawsuit was filed, the Court granted motions to intervene as defendants that were made by certain parents of children who attend parochial schools in New York and who receive remedial educational assistance under Title I. A three-judge court was convened to hear and decide the case pursuant to 28 U.S.C. § 2282.[3]

Plaintiffs then moved for summary judgment or, in the alternative, for a preliminary injunction. Relying on *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), and *Public Funds for Public Schools v. Marburger*, 358 F.Supp. 29 (D.N.J.) (three-judge court), *aff'd mem.*, 417 U.S. 961, 94 S.Ct. 3163, 41 L.Ed.2d 1134 (1974), discussed *infra*, the plaintiffs asserted that the Supreme Court twice "has faced the constitutional question raised in this case, and in both instances it has ruled the challenged statute unconstitutional on its face." Plaintiffs' Memorandum in Support of Motion for Summary Judgment at 2. The Court denied both motions. *National Coalition for Public Education and Religious Liberty v. Califano*, 446 F.Supp. 193, 196 (S.D.N.Y.1978). Not only did the plaintiffs fail to show the threat of irreparable injury that is a prerequisite to preliminary injunctive relief, but, as noted by the Court, an order halting the remedial education

program in the middle of the year would work an unwarranted hardship on the defendants and would harm the public interest. *Id.* at 195. The Court also rejected PEARL's summary judgment argument for two reasons.

First, the plaintiffs' challenge is *not* to this statute on its face; rather, they challenge Title I only "insofar as [it] authorizes the expenditure of federal funds to finance educational services within religious schools during school hours." Notice of Motion ¶ 3. The limited nature of this challenge to a particular application of the statute necessarily demands that this Court be fully informed on the exact manner in which these Title I funds are used, in order both that the Court may understand and evaluate the alleged constitutional improprieties of this use of Title I funds and that the Court may shape a suitable injunctive order should such improprieties be found.

Second, as the Supreme Court has noted,

The task of deciding when the Establishment Clause is implicated in the context of parochial school aid has proved to be a delicate one for the Court. Usually it requires a careful evaluation of the facts of the particular case. It would be wholly inappropriate for us to attempt to render an opinion on the First Amendment issue when no specific plan is before us. A federal court does not sit to render a decision on hypothetical facts . . .

*Wheeler v. Barrera*, [417 U.S. 402, 426–27, 94 S.Ct. 2274, 2288, 41 L.Ed.2d 159] (citations omitted). In evaluating a first amendment challenge, a court must examine, *inter alia*, whether "the statute and *its administration* [avoid] excessive entanglement with religion." *Meek v. Pittenger, supra*, 421 U.S. [349] at 358, 93 S.Ct. [1753] at 1760 [44 L.Ed.2d 217 (em-

---

**3.** This action was commenced by a complaint filed February 25, 1976 and is therefore unaffected by the repeal of the three-judge court provision. Act of August 12, 1976, Pub.L.No. 94–381, § 7, 90 Stat. 1120.

phasis added). Such an examination is not possible on the current record. *Id.* at 196.

An evidentiary hearing was conducted in May 1979. Plaintiffs called only one witness, Dr. John Ellis, Executive Deputy Commissioner for Educational Programs in the United States Office of Education. Plaintiffs' counsel stated that he was seeking to determine how the federal government interprets and administers Title I and proceeded to ask Dr. Ellis a series of primarily hypothetical questions based on prior Supreme Court decisions. Tr. 40–65. Pursuant to an agreement reached at a pretrial conference, the defendants presented the bulk of their case in the form of a narrative summary which was received into evidence. Defendants' Exh. T. This summary synthesized numerous affidavits, Defendants' Exh. U, Tabs A–1 to A–58, and documentary evidence, Defendants' Exhs. A–S, which described the operation of New York City's Title I program in nonpublic schools. The defendants also called seven witnesses who were teachers or administrators in the program.

At the start of the evidentiary hearing, plaintiffs' counsel stated that PEARL had no evidence showing that New York City's Title I program was unconstitutional. Tr. 8. Counsel explained that PEARL had sought to discontinue the suit against the City because "proof of such a [constitutional] violation and the financing of a trial record is beyond our means." *Id.* at 7–8. The City, however, had rejected PEARL's discontinuance offer.[4] The plaintiffs therefore asked the Court to enter judgment in favor of the City and allow the case to go forward against the two federal officials. The Court did not grant the request and plaintiffs conceded that "there is no violation in respect to any school within the City of New York and we ask no relief against the City of New York." *Id.* at 8.

Towards the end of the hearing, plaintiffs' counsel stated that "[o]ur basic premise is the statute on its face as construed by the Commissioner of Education is unconstitutional irrespective what happens in any school anywhere in the United States." *Id.* at 159. He then agreed with the Court's characterization of PEARL's argument as being "[n]ot that the statute itself is unconstitutional but [that it] is being unconstitutionally interpreted and applied." *Id.* at 60. Plaintiffs' counsel reaffirmed this position at the post-trial oral argument before the three-judge panel, P–Tr. at 17,[5] and reiterated his view that the case was unaffected by the lack of proof that New York City's Title I program violated the Constitution. *Id.* at 11.

The Court rejects plaintiffs' contention that "the issue in this case is not what is actually done; the issue in this case is what is authorized by the law which we are challenging." *Id.* at 11–12. This assertion is directly contradicted by the admonition of the *Wheeler* Court, quoted above, that a federal court must not issue decisions based on hypothetical situations. *Wheeler v. Barrera, supra,* 417 U.S. at 427, 94 S.Ct. at 2288. In *Wheeler,* the Supreme Court specifically declined to rule on the constitutionality of a Title I program that provided remedial services on the premises of parochial schools because it would be "wholly inappropriate" to render an opinion "when no specific plan is before us." *Id.* at 426, 94 S.Ct. at 2288. Obviously, it would be highly inappropriate for this Court to reject the exhaustive evidence that has been presented on New York City's Title I program and to resolve this suit on the basis of the plaintiffs' evidence about what *could* happen under the law. Accordingly, the factual summary and legal analysis that follows

---

4. Counsel for New York City stated at the hearing that the City opposed the plaintiffs' "concession of judgment in this case and . . if we had not been named as a party in this case we would move to intervene." Tr. 37–38. In describing the City's interest in seeing the program continued in its present form, counsel

remarked that "[i]t is not necessary for me to recount the cost to the City of educational deprivation." *Id.* at 38.

5. "P–Tr." signifies the transcript of the post-trial oral argument held before this three-judge Court on December 14, 1979.

relies on the undisputed evidence submitted on the implementation of Title I in New York City schools. The Court's constitutional ruling is, of course, confined to the fact situation specifically presented here.

### Factual Background

*Title I*

Title I was enacted in 1965 to provide federal funding for compensatory educational programs that are administered by local public educational agencies and are directed to educationally deprived children in low-income areas. Recognizing the significant correlation between poverty and learning deficiencies, Congress "declare[d] it to be the policy of the United States to provide financial assistance . . . to local educational agencies serving areas with concentrations of children from low-income families to expand and improve their educational programs by various means . . . which contribute particularly to meeting the special educational needs of educationally deprived children." 20 U.S.C. § 2701; *see* S.Rep.No.146, 89th Congress, 1st Sess., *reprinted in* [1965] U.S.Code Cong. & Admin.News, pp. 1446, 1450. The Act provides for annual congressional appropriations for programs proposed by local educational agencies ("LEA") and approved by state educational agencies. 20 U.S.C. § 2731. All programs are administered solely by the LEA in the particular area and are staffed entirely with the LEA's employees. 20 U.S.C. § 2734(m); 45 C.F.R. §§ 116.42, 116a.23(f). In order to be eligible for Title I funds, a program must satisfy certain statutory criteria that are designed to assure that the Act's purposes are advanced. For example, Title I funds may be provided only to children who meet the dual eligibility requirement of (1) educational deprivation, defined as below age-level performance and (2) residence in an area designated by the LEA, in accordance with Title I regulations, as having a high concentration of children from low-income families. *Id.* §§ 2722, 2732–2734. Federal financing is available only for programs that will supplement, rather than supplant, non-federally funded programs that would have been available in the absence of Title I funds. *Id.* §§ 2734(f), 2736(c).

Participation in Title I programs is not limited to children enrolled in public schools. The Act provides:

> To the extent consistent with the number of educationally deprived children in the school district of the local educational agency who are enrolled in private elementary and secondary schools, such agency shall make provision for including special educational services and arrangements (such as dual enrollment, educational radio and television, and mobile educational services and equipment) in which such children can participate . . . . Expenditures for educational services and arrangements pursuant to this section for educationally deprived children in private schools shall be *equal* (taking into account the number of children to be served and the special educational needs of such children) to expenditures for children enrolled in the public schools of the local educational agency.

20 U.S.C. § 2740(a) (emphasis added). Title I regulations require that each LEA provide services designed to meet the needs of educationally deprived children who attend private schools. 45 C.F.R. § 116a.23. These children must be given "genuine opportunities to participate," and the types of services to be provided shall be determined "on a basis comparable to that used in providing for the participation of public school children." *Id.*

As noted by the Supreme Court, Congress anticipated that "one of the options open to the local agency in designing a suitable program for private school children was the provision of on-the-premises instruction." *Wheeler v. Barrera, supra,* 417 U.S. at 422, 94 S.Ct. at 2286; *see* S.Rep.No.146, 89th Cong., 1st Sess., *reprinted in* [1965] U.S. Code Cong. & Admin.News, pp. 1446, 1457; 111 Cong.Rec. 5747–48 (1965) (remarks of Congressmen Goodell, Carey and Perkins). Federal and local officials administering the statute have adhered to the view that services directed to nonpublic school children

may be provided on the premises of the nonpublic institution. *Wheeler v. Barrera, supra,* 417 U.S. at 421–23, 94 S.Ct. at 2285–86; 45 C.F.R. § 116a.23(f); Affidavit of Genevieve Dane, Program Operations Branch Chief in HEW's Division of Education for Disadvantaged, sworn to April 20, 1979 ("Dane Aff."), ¶ 11; Affidavit of Lawrence F. Larkin, Director of the Bureau of Nonpublic School Reimbursable Services for the New York City Board of Education, sworn to April 17, 1979 ("Larkin Aff."), ¶ 9.

Title I regulations impose restrictions on the services provided on the premises of the nonpublic schools to assure that the programs remain secular both in content and setting. Public school personnel may provide instruction on nonpublic school premises only to the extent necessary to make such special services available to those educationally deprived children for whom the Title I program was designed. 45 C.F.R. § 116a.23(f). These services may be provided to eligible students only if they are not otherwise provided by the nonpublic school. *Id.* Title I funds may not be used to pay the salaries of private school teachers or employees, except for services performed outside their regular hours of duty under public supervision and control. *Id.* The LEA must maintain exclusive direction and control over all Title I services and funds, wherever provided; no public funds can be disbursed to the schools. *Id.* § 116.42. If any equipment or materials are used in a private school's Title I program, the LEA must maintain title to and physical control of the property and must remove it from the premises if necessary to prevent its being used for any purpose other than the Title I program. *Id.*

If a state or locality fails to comply with Title I requirements pertaining to the approval of local projects, disbursements of funds, or program supervision, the federal government must terminate or suspend Title I funding. 20 U.S.C. § 2836(a); 45 C.F.R. § 116.20. The statute provides, however, that in the event an LEA "is prohibit-

ed by law from providing for the participation in special programs for educationally deprived children enrolled in private elementary and secondary schools as required [by the Act], the Commissioner [of Education] shall waive the requirement, and shall arrange for the provision of services to such children through arrangements which shall be subject to the requirements of [the Act]." 20 U.S.C. § 2740(b)(1). This provision reflects Congress's intent "that state constitutional spending proscriptions not be pre-empted as a condition of accepting federal funds." *Wheeler v. Barrera, supra,* 417 U.S. at 417, 94 S.Ct. at 2283. If the LEA is prohibited by state or local law from providing for the "equitable" participation of private school students in Title I programs, the Commissioner waives the statutory requirement that the state assure such participation and "bypasses" local authorities by arranging for the direct provision of services to eligible private school children. 20 U.S.C. § 2740(b)(2). In Missouri, for example, state law prohibits the provision of Title I services on the premises of nonpublic schools during regular school hours. The United States Office of Education conducted a study in 1976 to determine the manner in which Title I services were being provided to nonpublic school children in four Missouri cities. The study concluded that the services provided at times other than during the normal school day were not comparable in quality, scope, and opportunity for participation to services provided during regular school hours. Affidavit of Joseph J. Vopelak, Acting Chief of the Institutional Services Section, Program Support Branch, in HEW's Division of Education for the Disadvantaged, sworn to April 20, 1979 ("Vopelak Aff."), ¶ 14. On the basis of this study, the Commissioner of Education directed that Title I services be provided directly to nonpublic school children in those four districts. *Id.* ¶ 16. Initial determinations of noncomparability have been made with respect to more than fifty other Missouri districts. *Id.*[6]

---

**6.** In 1970, parents of children enrolled in nonpublic schools filed a class action alleging that

the state had arbitrarily and illegally deprived their children of services to which they were

Title I is the largest single federally funded education program in the United States. During the 1979–1980 school year, services will be provided to approximately 4,800,000 public school children and 200,000 private school children across the nation. Dane Aff. # 3. About 4 percent of the projected budget, or $105,200,000, will be spent on services for private school children. *Id.*

*New York City's Title I Program*

The New York City Board of Education ("Board") is responsible for administering the largest program of Title I remedial educational services in the United States. During the 1978–1979 school year, a total of 404,686 public and nonpublic school students were eligible for Title I services. Larkin Aff. ¶ 34. Of that total, 33,285, or 8.2 percent, were enrolled in nonpublic schools. *Id.* ¶ 35. Because of budgetary and logistical limitations, however, only 13,265 of the eligible nonpublic school students were expected to receive Title I services during that year. *Id.*

In New York City, Title I remedial services are provided directly on the premises of the nonpublic schools during regular school hours. The Board adopted this arrangement only after experimenting with alternative programs. During the first academic year that Title I funds were available, the Board attempted to provide services to private school students after regular school hours on the premises of both the private and public schools. The results of this experiment, however, were quite discouraging. *Id.* ¶ 135. Attendance was poor, students were inattentive, teachers were tired, and parents were concerned about the safety of children leaving school late in the

afternoon. *Id.* ¶ 136. A suggested alternative to providing services at the nonpublic schools during the school day was to offer instruction to nonpublic school students at public schools during regular school hours. However, serious questions were raised about the constitutionality, under Article XI of the New York State Constitution, of allowing parochial school students to participate with public school students in programs conducted during regular school hours at the public school. *Id.* ¶ 138(a); Defendants' Exh. L at 3 (Statement by Board on Title I Proposals, August 31, 1966). Upon considering these legal problems and the difficulties created by an after-hours program, the Board decided to establish Title I programs on the premises of nonpublic schools during regular school hours. Larkin Aff. ¶ 138; Defendants' Exh. L at 3. In adopting this arrangement, the Board was cognizant of the need to maintain the secular integrity of the program. The Board thus stated that it

will provide the following services for educationally disadvantaged children in non-public schools, on their premises, during the school day: remedial reading, remedial arithmetic, speech therapy, and guidance counselling. The instruction will be given by peripatetic teachers, who will go from one school to another during particular periods; no teacher will be so assigned without his consent. The instruction will not duplicate any of the regular class-room work of the schools involved. Speech improvement instruction, for example, as distinguished from speech therapy (for stammering and other speech impediments), has been eliminated from the proposals as being too close

entitled under Title I. While remedial instruction was available in public schools during regular hours, such services were not provided at the parochial schools during the school day. This action resulted in the Supreme Court's decision in *Wheeler v. Barrera, supra.* The Court held that "the State is not obligated by Title I to provide on-the-premises instruction" because "comparable," not "identical" programs are mandated by the statute. 417 U.S. at 419, 94 S.Ct. at 2284. In remanding the case, the Court directed the Missouri Commis-

sioner and Board of Education to develop guidelines ensuring that the Title I comparability standard will be satisfied. As discussed above, the Court declined to rule on the Establishment Clause issue present in the case because no specific plan involving the placement of public school teachers in parochial schools was before the Court. The Court recognized, however, that this option was available to the state in implementing the Court's order on remand. *Id.* at 422.

to regular class-room work. Library services for non-public schools have likewise been eliminated as being outside the limited areas of remedial and therapeutic, and as constituting services to institutions more directly than to children.

Defendants' Exh. L at 3.

During the 1977–1978 school year, the Bureau of Nonpublic School Reimbursable Services analyzed the costs that would be incurred if the Title I program for nonpublic school students were to be conducted at sites other than the nonpublic schools. That analysis revealed that annual transportation costs plus other non-instructional expenses would amount to more than $4.2 million which, for the 1977–1978 academic year, was more than 42 percent of the total budget for the private school Title I program. Larkin Aff. ¶¶ 148, 152; Defendants' Exh. N (Analysis of Differences in Costs and Services for On-Premises and Off-Premises Services To Nonpublic School Pupils During the Regular School Day). The reduction in staff that would be required to meet those additional costs would result in the elimination of services to 5,039 students, 36 percent of those who received Title I services during the 1977–1978 year. Larkin Aff. ¶ 153.

The vast majority of nonpublic school students in New York City who are eligible for and actually receive Title I remedial services attend schools that are affiliated with one of several religious denominations. Board statistics show that approximately 87 percent of these students are enrolled in schools affiliated with the Roman Catholic Archdiocese of New York and Diocese of Brooklyn. Id. ¶ 156. An additional 9 percent of the Title I students attend Hebrew Day Schools. Id.

Five types of remedial services are provided to nonpublic school children who satisfy Title I eligibility criteria: remedial reading, reading skills instruction, remedial mathematics, English as a second language, and clinical and guidance services. Id. ¶ 39. These services are provided by teachers and support staff who are employed by the Board and subject solely to its supervision

and control. Id. ¶ 52. Title I teachers generally provide instruction to small groups of students and work with no more than 100 students in a week. Id. ¶ 49. The clinical and guidance professionals provide diagnostic testing, consultation and counseling services on an individual basis to children who are having difficulty benefiting from the Title I remedial program. Id. ¶¶ 47, 48.

Assignment to a nonpublic school Title I program is purely voluntary, and any teacher may refuse appointment to the program without losing seniority. Id. ¶ 54. Parochial school officials have no voice in the initial assignment of a Title I teacher or professional, and there is no known instance of any official or teacher requesting reassignment on religious grounds. Id. ¶¶ 56, 57. No inquiry is made into a staff person's religious affiliation or beliefs; therefore this has no bearing on appointment to a nonpublic school. Id. ¶ 55. Although the Board maintains no record of religious affiliations, the affidavits of Title I teachers submitted in this action demonstrate that most of them work in parochial schools with religious affiliations different from their own. Id. ¶¶ 55, 72. The vast majority of teachers are itinerant and spend less than five days a week at the same nonpublic school. Id. ¶ 60.

Each teacher and support professional assigned to a nonpublic school is given a detailed set of written instructions, as well as a series of oral instructions, that delineate his responsibilities and the restrictions imposed on his activities. Id. ¶¶ 62, 63. These guidelines emphasize that Title I personnel are independent public school employees who "do not service the entire school" and who have ultimate control over the selection of students for participation in the program. Id. ¶¶ 64, 65; Defendants' Exh. F at 130 (Board of Education Orientation Procedures for Nonpublic School Title I Programs). Teachers are instructed that they are not to engage in team teaching or cooperative instructional activities, although they may discuss a student's needs and progress with their counterparts on the parochial school faculty. Larkin Aff. ¶ 68.

Title I personnel are also directed not to introduce any religious topics into the curriculum or become involved in the religious aspects of the school. *Id.* ¶ 69. Periodic evaluations and direct program supervision assure that Title I staff members comply with the Board's guidelines and restrictions. *Id.* ¶¶ 73–85.

Title I teachers in nonpublic schools occupy classrooms that are specifically designated solely for that purpose and that are free from any religious symbols, pictures, or statues. *Id.* ¶¶ 103, 105. None of the materials used in any Title I program has any religious content. *Id.* ¶ 91. The Board retains title to and administrative control over all Title I property, and a comprehensive record keeping and inventory system guards against any diversion or misuse of equipment and materials. *Id.* ¶ 92. Title I teachers are instructed that when materials and supplies are not being used they should be secured, preferably in locked cabinets provided for that purpose. *Id.* ¶ 95. In compliance with the statute and its regulations, no Title I funds are paid to nonpublic schools to finance the salaries of regular classroom teachers, to construct facilities, or to reimburse the schools for any costs they incur in providing space for Title I programs. *Id.* ¶ 99.

### The Establishment Clause

Declining to rule on the constitutionality of a "hypothetical" Title I program conducted on the premises of a parochial school, the Supreme Court declared that "the First Amendment implications may vary according to the precise contours of the plan that is formulated." *Wheeler v. Barrera, supra,* 417 U.S. at 426, 94 S.Ct. at 2287–88. The Court stated, for example, that "a program whereby a former parochial school teacher is paid with Title I funds to teach full time in a parochial school undoubtedly would present quite different problems than if a public school teacher, solely under public control, is sent into a parochial school to teach special remedial courses a few hours a week." *Id.* The latter fact pattern described in *Wheeler* is now before this Court.

■ Resolution of this issue requires application of the tripartite Establishment Clause test established by the Supreme Court.

First, the statute must have a secular legislative purpose. *E. g., Epperson v. Arkansas,* 393 U.S. 97 [, 89 S.Ct. 266, 21 L.Ed.2d 228]. Second, it must have a "primary effect" that neither advances nor inhibits religion. *E. g., School District of Abington Township v. Schempp,* 374 U.S. 203 [, 83 S.Ct. 1560, 10 L.Ed.2d 844]. Third, the statute and its administration must avoid excessive government entanglement with religion. *E. g., Walz v. Tax Comm'n,* 397 U.S. 664 [, 90 S.Ct. 1409, 25 L.Ed.2d 697].

*Meek v. Pittenger, supra,* 421 U.S. at 358, 95 S.Ct. at 1760. Although easily and frequently recited, the test is not a precise formula, for "the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1970). The Court should not engage in a "legalistic minuet in which precise rules and forms must govern," for "[a] true minuet is a matter of pure form and style, the observance of which is itself the substantive end." *Id.* As directed by the Supreme Court, "[h]ere we examine the form of the relationship for the light that it casts on the substance." *Id.*

### 1. Secular Legislative Purpose

■ In considering legislative purpose, the Court must look to the statement of intent contained in the legislation itself, or to the legislative history. It must also look to the legitimate government interest in providing assistance to nonpublic schools and their students. In this regard, it is noteworthy that the Supreme Court has never invalidated an educational aid statute on the express ground that its purpose was the advancement of religion. *See, e. g., Wolman v. Walter,* 433 U.S. 229, 236, 97 S.Ct. 2593, 2599, 53 L.Ed.2d 714 (1977);

*Meek v. Pittenger, supra,* 421 U.S. at 363, 368, 95 S.Ct. at 1762, 1764; *Committee for Public Education v. Nyquist,* 413 U.S. 756, 773, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973); *Tilton v. Richardson,* 403 U.S. 672, 679, 91 S.Ct. 2091, 2096, 29 L.Ed.2d 790 (1971); *Lemon v. Kurtzman, supra,* 403 U.S. at 613, 91 S.Ct. at 2111.

■ The legislative history of Title I clearly demonstrates that the purpose of the statute was to give aid to needy children, regardless of where they attend school. *See* 20 U.S.C. § 2701; S.Rep.No. 146, 89th Congress, 1st Sess., *reprinted in* [1965] U.S.Code Cong. & Admin.News, pp. 1446, 1450. The government has a legitimate interest in providing remedial aid to private school students. Plaintiffs do not suggest that the enactment of Title I was motivated by an impermissible congressional purpose or design. Title I clearly serves a secular legislative purpose, and the statute satisfies the first prong of the three-part test.

### 2. *Primary Effect*

"Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting." *Hunt v. McNair,* 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973). The Establishment Clause precedents that guide this Court reflect a clear distinction between programs that provide aid directly to nonpublic parochial school students and those that either in form or substance provide direct assistance to the parochial schools themselves. This line was first drawn in *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711

(1947), in which the Court upheld the use of public funds to pay the bus fares of parochial school students. This arrangement was part of a general program under which the state paid the bus fares of all students attending public and nonpublic schools. According to the Court, the state contributed no money to the private schools, but merely helped children get to and from whatever school they attended. *Id.* at 17–18, 67 S.Ct. at 512. Similar reasoning was employed in *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), in upholding the constitutionality of a state statute authorizing textbook loans to children in public and private schools. The Court stated that "no funds or books are furnished to parochial schools and the financial benefit is to parents and children, not to schools." *Id.* at 244, 88 S.Ct. at 1926. Comparable textbook loan programs were subsequently approved by the Court in *Wolman v. Walter, supra,* 433 U.S. at 238, 97 S.Ct. at 2600, and *Meek v. Pittenger, supra,* 421 U.S. at 362, 95 S.Ct. at 1762. The Court has also affirmed a district court decision that upheld a state statute authorizing financial assistance to a broad class of needy students in public and nonpublic colleges. *Americans United for Separation of Church and State v. Blanton,* 433 F.Supp. 97 (M.D. Tenn.), *summarily aff'd,* 434 U.S. 803, 98 S.Ct. 39, 54 L.Ed.2d 65 (1977). Although the district court discussed Supreme Court decisions drawing constitutional distinctions between higher and lower levels of sectarian education,[7] the court relied primarily on the "child benefit" principles of *Everson* and *Allen.* Ultimately, the aid program was upheld because "the emphasis . . . [was] on the student rather than the institution, and . . . No one religion [was] favored by the program, nor [were] private or religious institutions favored over public institutions." *Id.* at 104.

---

7. *Compare Hunt v. McNair, supra,* and *Tilton v. Richardson, supra,* with *Levitt v. Committee for Public Education, supra,* and *Lemon v. Kurtzman, supra.* The Court has consistently found the religiously affiliated institutions in the college aid cases not to be pervasively sectarian, while so characterizing parochial elementary and secondary schools. *See* discus-

sion *infra.* The Court has indicated, however, that aid to a pervasively sectarian college may be constitutionally suspect. *Tilton v. Richardson, supra,* 403 U.S. at 682, 91 S.Ct. at 2097. Since *Blanton* involved colleges of this kind, 433 F.Supp. at 100, the court apparently relied on the fact that the aid flowed to the students and not to the institutions.

Statutes providing aid directly to parochial institutions were struck down in *Committee for Public Education v. Nyquist, supra*, and *Levitt v. Committee for Public Education*, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973). *Nyquist* involved, in part, a "maintenance and repair" provision authorizing grants to nonpublic schools without effective restrictions on the ways in which the funds could be used. The Court ruled that the inevitable effect of the grants was to "subsidize and advance the religious mission of sectarian schools." 413 U.S. at 780, 93 S.Ct. at 2969. The statute invalidated in *Levitt* authorized direct payments to private schools for expenses incurred in connection with testing, maintenance of enrollment records, maintenance of pupil health records, and recording of personnel qualifications and characteristics. Holding that the statute had the primary effect of advancing religion, the Court stated that the aid provided for secular functions was not "identifiable and separable" from assistance to sectarian activities. 413 U.S. at 480, 93 S.Ct. at 2819.

■ The mere identity of the party receiving government aid is not necessarily dispositive in determining whether a statute primarily advances religion. In *Nyquist* and *Sloan v. Lemon*, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973), the Court invalidated state statutes that provided tuition reimbursements and tax relief to parents of parochial school children. The Court looked beyond the formal recipient of the aid and found that its effect was to provide financial support for sectarian institutions. *Id.* at 832, 93 S.Ct. at 2986. And just as aid purportedly directed to students or parents may be impermissible, assistance provided directed to the institution may survive judicial scrutiny. For example, in *Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), the Supreme Court rejected a primary effect challenge to a federal statute that authorized direct grants to institutions of higher education for academ-

ic facilities. The Act permitted grants to sectarian schools, but only for facilities that would be used for a defined secular purpose, and expressly prohibited the use of the facilities for any religious activities.[8] Similarly, in *Hunt v. McNair, supra*, the Court upheld a state statute that provided financial assistance to institutions of higher education engaged in the construction of buildings and facilities. The Court relied, in part, on statutory restrictions prohibiting use of the facilities for religious activities and noted that the Baptist College involved in the case was not a "pervasively sectarian" institution. 413 U.S. at 743–44, 93 S.Ct. at 2874. The Court has recently upheld a state statute authorizing public funds to reimburse church-sponsored and secular nonpublic schools for expenses incurred in complying with certain state-mandated requirements pertaining to testing, reporting, and record keeping. *Committee for Public Education v. Regan*, —— U.S. ——, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980). In contrast to the statute previously invalidated in *Levitt v. Committee for Public Education, supra*, this provision covered only state-prepared tests—not those prepared by the private school teachers—and established an auditing system to monitor the use of state funds. Relying on these distinctions, the Court upheld the statute on the grounds that the nonpublic schools had no control over the tests; the nonpublic school teachers who graded the objective, multiple-choice exams had no control over the results; and the law provided ample safeguards against excessive or misdirected reimbursement. Cases such as *Regan, Hunt*, and *Tilton* reveal that under certain circumstances, the government may furnish funds or services directly to a sectarian institution if their use is effectively restricted to non-religious functions and activities.

Title I clearly adheres to the child benefit principle established in *Everson* and *Allen*. The student aid program established by the statute is religiously neutral and is potentially available to all needy children regard-

---

8. The Court invalidated, however, a statutory provision that imposed a twenty-year limitation on the federal government's right to recapture a portion of the facility's present value if any of the statutory restrictions were violated. 403 U.S. at 683–84, 91 S.Ct. at 2098.

less of where they attend school. As required by the statute, Title I services are provided "on an equitable basis" to public and private schoolchildren. 20 U.S.C. § 2740(b)(2). During 1978, for example, nationwide expenditures for nonpublic school students accounted for only four percent of the total fiscal year appropriation for Title I. Dane Aff. ¶ 3. In New York, about eight percent of Title I funds was budgeted for private school children. Larkin Aff. ¶ 35. Fewer than one-fourth of the nonpublic schools in the City have Title I programs conducted on their premises. *Id.* Services are provided to eligible nonpublic school students on the premises of their schools during regular school hours because that is the location "where the needs of the children can best be served," 45 C.F.R. § 116a.19(c), and where these students can receive services that are "comparable" to those provided in public schools, *id.* § 116a.23(c).

Unlike the direct institutional aid statutes invalidated in *Nyquist* and *Levitt*, Title I funds and services do not flow to the parochial schools. Nor are the students merely the formal recipients of the aid. The program is therefore not comparable to a tuition reimbursement or tax break offered only to parents of private school students because it does not relieve the schools' financial burdens or supply funds free from use limitations and is not limited to a small class of beneficiaries. *Cf. Sloan v. Lemon, supra,* 413 U.S. at 832, 93 S.Ct. at 2986 (invalidating state-sponsored tuition reimbursement for parents of children in nonpublic schools, regardless of income level, as financial support for religious institution); *Committee for Public Education v. Nyquist, supra,* 413 U.S. at 783, 791, 93 S.Ct. at 2970, 2975 (invalidating tuition reimbursement and tax relief for parents of students in nonpublic schools as constituting "a charge made upon the state for the purpose of religious education"). In the words of the Supreme Court, "the legislative aim [of Title I] was to provide needed assistance to educationally deprived *children* rather than to specific schools." *Wheeler v. Barrera, supra,* 417 U.S. at 406, 94 S.Ct. at 2278

(emphasis in original). In short, neither the statute nor the programs it has engendered constitute a vehicle for advancing religious education.

■ The parochial schools whose students receive Title I services may reap some incidental benefits from the program. The Supreme Court, however, "has not accepted the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its resources on religious ends." *Hunt v. McNair, supra,* 413 U.S. at 743, 93 S.Ct. at 2874. In fact, Title I funds cannot be used for services that would supplant programs that would otherwise have been available in the absence of federal funds. 20 U.S.C. § 2736(c); 45 C.F.R. § 116.40. Statutory regulations also insure that Title I materials and equipment will not be used to benefit the parochial schools where services are provided. 45 C.F.R. § 116.42(a); Larkin Aff. ¶¶ 92–98. The incidental benefits that may inure to a parochial school where Title I services are provided are insufficient to render the statute unconstitutional. *See Hunt v. McNair, supra,* 413 U.S. at 742, 93 S.Ct. at 2873.

■ Title I's adherence to the child benefit principle does not, however, make the statute automatically immune from a primary effects challenge. Neither *Everson* nor *Allen* provides a "per se immunity" from judicial examination of the "substance" of a government aid program. *Committee for Public Education v. Nyquist, supra,* 413 U.S. at 781, 93 S.Ct. at 2969. In subsequent decisions the Court has carefully pointed out the special characteristics of the government assistance provided in those cases.

In *Everson,* the Court found the bus fare program analogous to the provision of services such as police and fire protection, sewage disposal, highways, and sidewalks for parochial schools. Such services, provided in common to all citizens, are "so separate and so indisputably marked off from the religious function," that they may fairly be viewed as reflections of a neutral posture toward reli-

gious institutions. *Allen* is founded upon a similar principle. The Court there repeatedly emphasized that upon the record in that case there was no indication that textbooks would be provided for anything other than purely secular courses.

*Id.* at 781–82, 93 S.Ct. at 2970 (citations omitted), *quoted in Wolman v. Walter, supra,* 433 U.S. at 251 n.18, 97 S.Ct. at 2607 n.18.

The *Wolman* Court upheld the use of public school employees to provide on-premises diagnostic services and off-premises therapeutic services to nonpublic school students. According to the Court, diagnostic services, unlike teaching or counseling, have little or no educational content, are not associated with the school's educational mission, and would not be subject to religious pressure or influence. *Id.* at 244, 97 S.Ct. at 2603. Because the diagnostician has only limited contact with the student, there is less opportunity for the transmission of religious views. *Id.* The Court acknowledged that the therapist who provides guidance and remedial services may establish a more substantial and long-term relationship with the student through which religious views could be conveyed. *Id.* at 247, 97 S.Ct. at 2605. Yet the Court concluded that the danger of religious advancement does not arise if the services are provided at religiously neutral locations, for it is "the pervasively sectarian atmosphere of the church-related school" that creates environmental pressures capable of "alter[ing] the [public school employee's] behavior from its normal course." *Id.* In the view of the *Wolman* Court, the ideological pressures generated by the pervasive sectarian atmosphere of a religious institution are qualitatively greater, and therefore constitutionally different, than the minimal influence on a teacher's behavior that may result from merely teaching a student enrolled in a parochial school. Furthermore, the nature of the student-teacher interaction and the location where it occurs were apparently more important to the Court than whether the student or the school was the direct recipient of the aid; simple conformity to the child benefit standard does not assure constitutionality.

The Supreme Court has repeatedly declared that "[w]hether the subject is 'remedial reading,' 'advanced reading,' or simply 'reading,' a teacher remains a teacher, and the danger that religious doctrine will become intertwined with secular instruction persists." *Meek v. Pittenger, supra,* 421 U.S. at 370, 95 S.Ct. at 1766, *quoted in NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 501, 99 S.Ct. 1313, 1319, 59 L.Ed.2d 533 (1979).[9] In contrast to *Everson, Allen,* and *Regan,* the case at bar involves government aid in the form of ongoing educational instruction that cannot be screened in advance for ideological content. "In terms of potential for involving some aspect of faith or morals in secular subjects, a textbook's content is ascertainable, but a teacher's handling of a subject is not." *Lemon v. Kurtzman, supra,* 403 U.S. at 617, 91 S.Ct. at 2113 (invalidating, in part, state-subsidized salary supplement for nonpublic school teachers who teach only secular courses). And unlike the government-sponsored diagnostic services upheld in *Wolman,* Title I provides continuous remedial instruction that entails more than minimal teacher-student contact.

Title I services are comparable to the off-premises therapeutic and remedial services approved by the *Wolman* Court. Yet in that case, the Court relied on the grounds that the use of a religiously neutral site negated the danger of religious advancement.

---

**9.** The Supreme Court's decision in *Meek,* which in part invalidated the provision of "auxiliary services" on the premises of nonpublic schools, is critical to the resolution of the issue in this case. That case is discussed more extensively in section 3, the "excessive entanglement" portion of this Opinion, because the Court ruled on entanglement grounds. 421 U.S. at 369, 372, 95 S.Ct. at 1765. Of course the *Meek* Court was also concerned about the program's potential for impermissibly advancing religion, *id.* at 370–72, 95 S.Ct. at 1765–66, and another section of the statute challenged in *Meek* was invalidated on that ground, *id.* at 363, 366, 95 S.Ct. at 1762, 1763.

**1262**

■ The question before this Court is whether the apparent differences between Title I and the programs upheld in *Everson, Allen, Regan,* and *Wolman* render this statute as applied unconstitutional. The Court concludes that they do not. The determination that Title I as applied does not have a primary effect that advances religion is based, in part, on: the characteristics of the parochial schools where services are provided; the regulations restricting the activities of Title I teachers and the use of Title I materials; and, most importantly, the substantial evidentiary record compiled in this case that demonstrates to the Court's satisfaction that the program has remained free from religious influences and has not promoted the religious mission of the nonpublic schools.

In describing the "primary effect" prohibited by the Establishment Clause, the Supreme Court has referred to aid flowing to "an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission." *Hunt v. McNair, supra,* 413 U.S. at 743, 93 S.Ct. at 2874. The profile of a "pervasively sectarian school" has been described in several Supreme Court cases. *See, e. g., Meek v. Pittenger, supra,* 421 U.S. at 356, 95 S.Ct. at 1758; *Committee for Public Education v. Nyquist, supra,* 413 U.S. at 767–68, 93 S.Ct. at 2962–63; *Levitt v. Committee for Public Education, supra,* 413 U.S. at 476, 93 S.Ct. at 2816. Typically, such schools:

(1) are controlled by churches or religious organizations, (2) have as their purpose the teaching, propagation and promotion of a particular religious faith, (3) conduct their operations, curriculums and programs to fulfill that purpose, (4) impose religious restrictions on admissions, (5) require attendance at instruction in theology and religious doctrine, (6) require attendance at or participation in religious worship, (7) are an integral part of the religious mission of the sponsoring church, (8) have as a substantial or dominant purpose the inculcation of religious values, (9) impose religious restrictions on faculty appointments, and (10) impose re-

ligious restrictions on what the faculty may teach.

*Meek v. Pittenger, supra,* 421 U.S. at 356, 95 S.Ct. at 1758–59. According to the Court, "the potential for impermissible fostering of religion" arises when public employees perform "important educational services in schools in which education is an integral part of the dominant sectarian mission and in which an atmosphere dedicated to the advancement of religious belief is constantly maintained." *Id.* at 371–72, 95 S.Ct. at 1766.

This description of a hypothetical, pervasively sectarian institution was relied upon by plaintiffs' counsel in questioning Dr. Ellis, the Executive Deputy Commissioner for Educational Programs, at the trial in this case. Counsel sought to establish that the federal government interpreted and applied Title I to authorize government assistance to students who attended nonpublic schools that fit the pervasively sectarian profile. Tr. 42–60. As discussed above, this line of questioning missed the mark, for the Court cannot rule on the basis of even well-founded hypotheticals in the absence of evidence concerning a concrete program. In *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), the Court upheld direct federal grants to four colleges with religious affiliations. Holding that none was pervasively sectarian, a plurality of the Court stated that "[i]ndividual projects can be properly evaluated if and when challenges arise with respect to particular recipients and some evidence is then presented to show that the institution does in fact possess these characteristics." *Id.* at 682, 91 S.Ct. at 2097–2098. This Court, therefore, must evaluate Title I with respect to the New York City program on the basis of the evidence presented in this case.

The record before the Court includes uncontroverted evidence from administrators of Catholic and Hebrew Day schools where Title I services are provided that demonstrates that these institutions do not have the characteristics of the pervasively sectarian schools described by the Supreme Court. The evidence shows that these nonpublic

schools (1) do not restrict the admission of students on religious grounds, Affidavit of Reverend Monsignor John J. Healy, sworn to March 22, 1979 ("Healy Aff."), ¶¶ 27–30; Affidavit of Reverend Vincent D. Breen, sworn to March 22, 1979 ("Breen Aff."), ¶¶ 20–25; Affidavit of Rose Fogel, sworn to April 16, 1979 ("Fogel Aff."), ¶ 7; Affidavit of Rabbi David Rogoff, sworn to April 15, 1979 ("Rogoff Aff."), ¶ 7; (2) do not restrict the hiring of teachers on religious grounds, Healy Aff. ¶¶ 32–35; Fogel Aff. ¶ 10; Rogoff Aff. ¶ 9; (3) do not attempt to compel their students to accept or obey the doctrines of the sponsoring church or religious organization, Healy Aff. ¶¶ 21–26; Breen Aff. ¶¶ 35–37; Fogel Aff. ¶ 7; Rogoff Aff. ¶ 7; (4) offer separate programs of secular and religious instruction and do not impose religious restrictions on the content of the instruction offered, Healy Aff. ¶¶ 36–47; Breen Aff. ¶¶ 26–29; Fogel Aff. ¶¶ 8, 9; Rogoff Aff. ¶ 8. Furthermore, the numerous affidavits of Title I teachers and professionals show that these public employees do not perceive a "dominant sectarian mission" and have not been subject to religious pressures or influences in the parochial schools in which they work. *See, e. g.,* Affidavit of Gail Meisel, sworn to April 12, 1979, ¶ 23; Affidavit of Susan Seidler, sworn to April 5, 1979, ¶ 19; Affidavit of Carol Almour, sworn to April 5, 1979, ¶ 18; Affidavit of Anna Marie Carrillo, sworn to March 27, 1979, ¶ 19; Affidavit of Fran Levy, sworn to March 27, 1979, ¶ 19. New York City's use of public school teachers on private school premises does not, therefore, create the same degree of potential for religious advancement that the *Meek* Court feared would result from placing public employees in pervasively sectarian institutions. *See Hunt v. McNair, supra,* 413 U.S. at 743–44, 93 S.Ct. at 2874 (rejecting primary effect challenge to state aid to college that could not be deemed pervasively sectarian; although trustees were elected by state Baptist Convention, whose approval was required for certain financial transactions and all charter amendments, no religious restrictions were imposed on faculty membership or student admissions).

The distinctions between the New York City schools where Title I services are provided and the pervasively sectarian schools described in *Meek* and other cases does not, however, ensure that the Title I program will not promote religion. The Supreme Court's opinion in *Wolman v. Walter, supra,* demonstrates that even government aid to a religiously affiliated, but not pervasively sectarian, private school can have this unconstitutional effect. The schools involved in *Wolman* did not restrict the admission of students or the hiring of teachers on religious grounds, did not require pupils who were not members of the sponsoring church to attend religion classes, and did not require teachers to teach religious doctrine as part of the secular courses taught in the school. 433 U.S. at 234–35, 97 S.Ct. at 2598. Yet the *Wolman* Court indicated that these characteristics were not sufficient to distinguish that case from prior decisions. *Id.* at 235 & n.4, 249–51, 97 S.Ct. at 2598 & n.4, 2606–07. Furthermore, the Court upheld the provision of remedial and therapeutic services because "[s]o long as these types of services are offered at *truly religiously neutral locations,* the danger perceived in *Meek* does not arise." *Id.* at 247, 97 S.Ct. at 2605 (emphasis added). Finally, a provision authorizing the loan to students or their parents of instructional materials and equipment "incapable of diversion to religious use" was invalidated in *Wolman* because, "[i]n view of the impossibility of separating the secular education function from the sectarian, the state aid inevitably flows in part in support of the religious role of the schools." *Id.* at 248–50, 97 S.Ct. at 2605–2607.

Divorcing the secular function from the sectarian is not impossible with respect to the educational services provided by Title I. The equipment and materials stored at non-public schools are used exclusively for Title I instruction and are secured in Title I classrooms when not being used by public school employees. Title I teachers are well aware of the regulations restricting their own activities and the use of Title I materials. The *Wolman* Court rejected the argument that the loan provision should be up-

held because materials were loaned to parents and students and not to the private schools. According to the Court, it would "exalt form over substance" to treat this arrangement any differently than a previously invalidated provision authorizing direct loans of materials to the nonpublic schools. *Id.* at 250, 97 S.Ct. at 2606. In contrast to either of these arrangements, Title I is a true student aid program, not merely a vehicle for channeling assistance to private institutions. Although the Supreme Court has refused to extend to other items the presumption of neutrality applied to textbooks, *id.* at 252 n.18, 97 S.Ct. at 2608 n.18, the evidence presented here demonstrates that Title I materials and equipment are not diverted from their intended use and do not promote any religious activity. In short, the publicly owned instructional materials do not support the collective educational enterprise of the parochial school.

In *Wolman,* the "religiously neutral locations" where private school students received remedial services were "neither physically nor educationally identified with the functions of the nonpublic school." *Id.* at 246–47, 97 S.Ct. at 2605, *quoting Wolman v. Essex,* 417 F.Supp. 1113, 1123 (S.D.Ohio 1976), *aff'd in part, rev'd in part sub nom. Wolman v. Walter, supra.* In New York City, Title I services are provided on the premises of parochial schools, typically in classrooms set aside for that purpose. Although physically unified, secular and sectarian instruction remain educationally distinct. Title I classrooms are free from religious symbols, contain separate materials and equipment, and are run solely by public school employees who are not subject to the supervision of private school administrators. Title I teachers and supervisors develop their own curricula, and no lessons have any religious or ideological content.

In certain respects, this arrangement resembles a situation depicted by Justice

Brennan in an opinion concurring with the Court's denial of certiorari in the case of *School District of Hartington v. Nebraska State Board of Education,* 188 Neb. 1, 195 N.W.2d 161 (1972), *cert. denied,* 409 U.S. 921, 93 S.Ct. 220, 34 L.Ed.2d 182 (1972). In *Hartington,* the Nebraska Supreme Court upheld a Title I grant proposal that involved the use of public funds to lease two unused classrooms in a Catholic High School that would be used for remedial education courses for public and private school students. Under the lease, the school district had full and exclusive control over the classrooms and the remedial instruction; no religious objects or pictures remained in the rooms. Justice Brennan, who is generally not sympathetic to government programs assisting religious institutions,[10] found the plan perfectly acceptable.

> There is not the slightest suggestion that this was a subterfuge to make a subsidy to the parochial school, or anything except an arrangement motivated solely by the lack of space in the public schools. Thus, the school district would have no part, whatever in the curriculum of the parochial school either by way of subsidy of its costs through financing of teaching or otherwise. The remedial reading and remedial mathematics courses would operate completely independently of that curriculum and of the Catholic school administration. . . . I have heretofore expressed my view that the First Amendment does not render unconstitutional "every vestige, however slight, of cooperation or accommodation between religion and government." *Abington School District v. Schempp,* 374 U.S. 203, 294 [83 S.Ct. 1560, 1609, 10 L.Ed.2d 844] (1963) (concurring opinion). The accommodation involved in this case would not trespass beyond permissible bounds.

409 U.S. at 925–26, 93 S.Ct. at 222–223. Justice Brennan's remarks are particularly relevant to the case at bar. The abundant

---

**10.** For example, Justice Brennan dissented from the Supreme Court's recent opinion upholding the use of public funds to reimburse church-sponsored private schools for expenses incurred in performing various services mandated by the state. *Committee for Public Education v. Regan, supra,* —— U.S. ——, 100 S.Ct. at 851 (Blackmun, J., dissenting in an opinion joined by Justices Brennan and Marshall). He also dissented from that portion of the Court's opinion in *Meek v. Pittenger, supra,* that upheld the loan of textbooks to nonpublic school children. 421 U.S. at 373, 95 S.Ct. at 1767 (Brennan, J., dissenting).

evidence presented in this action demonstrates uniform compliance with the extensive Title I regulations establishing a well defined dichotomy between purely secular instruction and activities subject to religious influences. *See generally* Larkin Aff. ¶¶ 85, 98, 105.

This evidentiary record is a critical feature distinguishing this case from prior decisions relied upon by the plaintiffs. The Supreme Court has repeatedly warned that the placement of public school teachers in parochial schools, unlike the provision of textbooks or school buses, creates a danger that "religious doctrine will become intertwined with secular instruction," *Meek v. Pittenger, supra,* 421 U.S. at 370, 95 S.Ct. at 1766, *quoted in NLRB v. Catholic Bishop of Chicago, supra,* 440 U.S. at 501, 99 S.Ct. at 1319, because the "pressures of the environment might alter [the teachers'] behavior from its normal course," *Wolman v. Walter, supra,* 433 U.S. at 247, 97 S.Ct. at 2605. Even the "diminished probability of impermissible conduct is not sufficient" to ensure constitutionality. *Meek v. Pittenger, supra,* 421 U.S. at 371, 95 S.Ct. at 1766. Yet in these cases where the Court spoke in terms of potential dangers or probabilities, the program or statute at issue was challenged shortly after enactment and evidence concerning its operation was scarce. *See, e. g., Wolman v. Walter, supra,* 433 U.S. at 233, 97 S.Ct. at 2597; *Meek v. Pittenger, supra,* 421 U.S. at 352, 95 S.Ct. at 1756; *Levitt v. Committee for Public Education, supra,* 413 U.S. at 474, 93 S.Ct. at 2816.

New York City has been providing Title I services in nonpublic schools for fourteen years. The evidence presented in this action includes: extensive background information on Title I; an in-depth description of New York City's program; a detailed review of Title I rules and regulations and the ways in which they are enforced; and the testimony and affidavits of federal officials, state officers, school administrators, Title I teachers and supervisors, and parents of children receiving Title I services. The evidence establishes that the result feared in other cases has not materialized in the City's Title I program. The presumption—that the "religious mission" will be advanced by providing educational services on parochial school premises—is not supported by the facts of this case.

The Court will not conjure up hypothetical situations in the face of a fourteen year record. *See Wheeler v. Barrera, supra,* 417 U.S. at 426–27, 94 S.Ct. at 2287–88. On the basis of all the evidence presented, the Court concludes that the risk of religious advancement has not been realized and New York City's Title I program does not have an unconstitutional primary effect.

### 3. *Excessive Entanglement*

The Court now turns to the final prong of the tripartite Establishment Clause test. To satisfy this third element, Title I must avoid "excessive entanglement" between the government and religious institutions. While recognizing that some interaction is inevitable, the Supreme Court has sought to prevent the intrusion of either into the realm of the other. As stated by the Court, "[t]he test is inescapably one of degree." *Walz v. Tax Comm'n,* 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970).

The plaintiffs contend that the issue in this case was resolved by the Supreme Court's decision on entanglement grounds in *Meek v. Pittenger, supra,* and its summary affirmance of the district court opinion in *Public Funds for Public Schools v. Marburger, supra.*[11] The defendants, in turn,

---

11. In *Public Funds for Public Schools v. Marburger,* 358 F.Supp. 29 (D.N.J. 1973), *summarily aff'd,* 417 U.S. 961, 94 S.Ct. 3163, 41 L.Ed.2d 1134 (1974), the district court invalidated two provisions of a state statute that: (1) authorized funds for reimbursing nonpublic school students and their parents for the cost of secular textbooks and supplies; and (2) provided funds to the nonpublic schools to acquire secular supplies, equipment, and auxiliary services. The court found that both provisions had the un-

constitutional effect of advancing religion and created the potential for excessive entanglement. *Id.* at 36–42.

In *Meek,* the Court characterized its affirmance of *Marburger* as "a decision on the merits as to the constitutionality of New Jersey's auxiliary-services program [that] is entitled to precedential weight." 421 U.S. at 370 n. 20, 95 S.Ct. at 1766. Because the Supreme Court's opinion in *Meek* is substantially similar to that of the

assert that "[t]he central issue in this case is whether an on-premises Title I program gives rise to the same excessive administrative and political entanglement that doomed the auxiliary services program in *Meek*." Post-Trial Brief of Intervenor-Defendants James and Bessie Bovis at 39. Although this characterization of the case unduly slights the primary effect issue left open in *Meek*, 421 U.S. at 369, 95 S.Ct. at 1765, the question of excessive entanglement is pervasive and, of course, potentially dispositive.

The *Meek* Court (1) upheld a statutory provision authorizing the loan of textbooks to public and nonpublic school children; (2) invalidated the loan of instructional materials and equipment directly to the nonpublic schools; and (3) struck down the use of public school employees to provide auxiliary services to nonpublic school children on the premises of the nonpublic school. Some of the on-premises auxiliary services prohibited in *Meek*, such as remedial instruction and counseling, are comparable to the Title I services challenged here. The Court expressly declined to decide whether the provision of these services had the "unconstitutional primary effect of advancing religion," although it invalidated the loan of instructional material on that ground. 421 U.S. at 363, 369, 95 S.Ct. at 1762. Instead, the Court held that "[t]he prophylactic contacts required to ensure that teachers play a strictly nonideological role . . . necessarily give rise to a constitutionally intolerable degree of entanglement between church and state." *Id.* at 370, 95 S.Ct. at 1765, *citing Lemon v. Kurtzman, supra*, 403 U.S. at 619, 91 S.Ct. at 2114. In the Court's view, to be certain that auxiliary teachers remain religiously neutral, the state would have to restrict their activities and then

"engage in some form of continuing surveillance to ensure that those restrictions were being followed." *Id.* at 372, 95 S.Ct. at 1766–67. In addition to this "administrative entanglement," the Court found "a serious potential for divisive conflict over the issue of aid to religion—'entanglement in the broader sense of continuing political strife.' " *Id., quoting Committee for Public Education v. Nyquist, supra*, 413 U.S. at 794, 93 S.Ct. at 2976. According to the Court, the recurrent nature of the appropriations process and the repeated confrontations between proponents and opponents of the auxiliary-services program provided successive opportunities for political fragmentation along religious lines.

> This potential for political entanglement, together with the administrative entanglement which would be necessary to ensure that auxiliary-services personnel remain strictly neutral and nonideological when functioning in church-related schools, compels the conclusion that [the statute] violates the constitutional prohibition against laws "respecting an establishment of religion."

*Id.*[12]

■ To determine whether Title I creates excessive entanglement between government and religion, this Court must examine "the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the relationship between the government and the religious authority." *Lemon v. Kurtzman, supra*, 403 U.S. at 615, 91 S.Ct. at 2112. This inquiry reveals that Title I does not suffer from the same infirmities that doomed the auxiliary services program in *Meek*.

district court in *Marburger*, this Court has focused on the *Meek* decision.

**12.** The Court's decision to rely upon a combination of the two forms of entanglement may reflect its belief that the use of publicly employed teachers mitigated the danger of administrative entanglement. In fact, the *Meek* Court expressly recognized that the potential for "fostering of religion" is "somewhat reduced" under these circumstances. 421 U.S. at 372, 95 S.Ct. at 1766. In *Lemon v. Kurtzman*,

*supra*, the first case decided on entanglement grounds, the Court invalidated statutes that authorized salary subsidies for parochial school teachers who were obviously subject to the pervasively sectarian atmosphere of the schools. Since the teachers in *Meek* were public employees, they were presumably less susceptible to such influences. Arguably, the risk of administrative entanglement alone would have been an insufficient ground to invalidate the statute.

First, the true beneficiaries of Title I are educationally deprived children, not the parochial schools that they attend. See section 2 *supra*. The "character" of these institutions is still relevant, however, because the program provides some incidental benefits to the schools and results in some contact between school officials and Title I personnel. In ruling that the auxiliary services program created excessive entanglement, the *Meek* Court relied in part on its determination that services were provided in schools with a "dominant sectarian mission . . . in which an atmosphere dedicated to the advancement of religion is constantly maintained." *Id.* at 371, 95 S.Ct. at 1766. Similarly, in striking down state subsidies for parochial school teachers' salaries in *Lemon v. Kurtzman, supra,* the Court emphasized the pervasively sectarian nature of the schools involved. 403 U.S. at 615–20, 91 S.Ct. at 2112–14. According to the Court, such schools create a danger that religious doctrine will permeate secular instruction and constant surveillance would be necessary to insure that teachers do not engage in the impermissible fostering of religion. 421 U.S. at 370, 372, 95 S.Ct. at 1765, 1766; 403 U.S. at 619, 91 S.Ct. at 2114. As described above, the typical nonpublic school where Title I services are provided in New York does not fit the Supreme Court's profile of a pervasively sectarian institution. Nor do the Title I personnel assigned to nonpublic schools perceive a dominant sectarian mission or atmosphere in the schools in which they teach. See section 2 *supra.*

This Court recognizes that the danger of religious advancement may be present in a parochial school that is not pervasively sectarian. *See Wolman v. Walter, supra,* 433 U.S. at 235 & n.4, 249–51, 97 S.Ct. at 2598 & n.4, 2606–07, and discussion in section 2 *supra.* Yet the Supreme Court's emphasis on the characteristics of pervasively sectarian institutions indicates that such schools enhance the danger that religious views will be fostered. Accordingly, to the extent that this risk is minimized in New York City's nonpublic schools, which are not pervasively sectarian, the need for continuous surveillance to guard against this danger is correspondingly reduced.

Second, the nature of the aid provided by Title I and the structure of New York City's program militates against church-state entanglement. In contrast to *Lemon* and other cases, no Title I funds are disbursed to nonpublic schools or their employees. Like *Meek*, however, public school employees do provide services on the premises of the nonpublic schools. Yet in *Meek*, not only were the schools pervasively sectarian, but the record provided little or no information on how the publicly employed teachers performed their services or were supervised. *See Meek v. Pittinger,* 374 F.Supp. 639, 656–57 (E.D.Pa.1974), *aff'd in part, rev'd in part,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975). The Supreme Court thus held that the district court "erred in relying entirely on the good faith and professionalism of the secular teachers and counselors functioning in church-related schools to ensure that a strictly nonideological posture is maintained." 421 U.S. at 369, 95 S.Ct. at 1765. This Court, however, need not rely solely on the good faith of Title I teachers and supervisors. While the district court in *Meek* stated that "[t]here is no evidence whatsoever that the presence of the therapists in the schools *will* involve them in the religious missions of the schools," 374 F.Supp. at 657 (emphasis added) the affirmative evidence before this Court establishes that Title I personnel *have not* fostered religious views or advanced religious activities. The record here includes a detailed description of how the City's Title I program has operated over a long period of time. Furthermore, the undisputed testimony of numerous Title I personnel demonstrates that they strictly adhere to the regulations restricting their own activities and the use of materials, and that they view their role as independent of the nonpublic schools' instructional program. *See, e. g.,* Affidavit of Ilene Baron, sworn to April 5, 1979, ¶¶ 7, 8; Affidavit of Elizabeth Krywucki, sworn to April 5, 1979, ¶¶ 8, 9; Affidavit of Marilyn Lefkowitz, sworn to April 5, 1979, ¶¶ 7, 8; Affidavit of Lenore Haber, sworn to April 5, 1979, ¶¶ 7, 8. In short,

because the aid provided under Title I does not result in an "impermissible fostering of religion," the "continuing surveillance" deemed necessary in *Meek* is not required to guard against the advancement of religious views or pursuits.

The relationship between the government and religious authorities is the third factor that must be examined to determine whether Title I creates excessive administrative entanglement. Two different types of administrative relationships arise out of New York City's nonpublic school Title I program: (1) supervision of Title I teachers and professionals by Title I and other public administrators; and (2) routine administrative contact between Title I personnel and nonpublic school administrators.

The first relationship—the supervision of public employees by other public officials—does not directly involve any interaction between the government and the religious institutions. Yet this case involves public supervision on the premises of the parochial schools, an arrangement that the *Meek* Court considered excessively entangled. *See* 421 U.S. at 370–72, 95 S.Ct. at 1765–66. *Meek*, however, does not govern the situation here. The Title I classrooms in which teaching and supervision generally occur are free from religious influences and are distinct from the facilities used by the nonpublic school for regular instructional activities. In the words of Lawrence Larkin, who supervises the City's Title I program for nonpublic schools:

the operation of the Title I program in the nonpublic schools is similar in all material respects to the public school Title I

program. In particular, I view the nonpublic school Title I classroom as a school within a school, unaffected by the fact that the nonpublic school in which it is situated is sponsored by or affiliated with a religious denomination.

Larkin Aff. ¶ 107. To the extent that the Title I facility can be considered a public school classroom in a nonpublic school, this program is comparable to the arrangement approved in *Wolman*. As stated by the *Wolman* Court, "[i]t can hardly be said that the [public] supervision of public employees performing public functions on public property creates an excessive entanglement between church and state." 433 U.S. at 248, 97 S.Ct. at 2605.[13] Furthermore, Title I supervisors maintain a complete separation between Title I activities and the regular programs of the parochial schools. Larkin Aff. ¶ 78. The supervisors have only casual and periodic contact with nonpublic school administrators and little or no contact with nonpublic school teachers when they visit the schools. Affidavit of Roberta Spiegelman, sworn to April 5, 1979, ¶¶ 19, 20; Affidavit of Lucille Stovall, sworn to April 5, 1979, ¶¶ 13, 14. This Court thus disagrees with the plaintiffs' unsupported charge that such supervision constitutes "intrusionary investigatory entrances into the religious schools." Plaintiffs' Trial Memorandum of Law at 10. The supervisor reviews and evaluates only the performance of the Title I teacher in the Title I classroom; neither the parochial school nor its instructional program is subject to public examination. The occasional visits made by Title I supervisors and coordinators do not, therefore, give rise to excessive entanglement.

---

**13.** The intervenor-defendants point out that if New York City leased the Title I classrooms from the nonpublic schools, the arrangement would be comparable to that upheld in *School District of Hartington v. Nebraska State Board of Education, supra.* These defendants thus argue that

[i]f such lease arrangements existed, the New York City nonpublic school Title I program would presumably be constitutional under the Court's analysis in *Wolman* as well as Justice Brennan's analysis in *Nebraska State Board of Education v. School District of Hartington [School District of Hartington v. Nebraska State Board of Education]*, 195

N.W.2d 161 (Neb.), *cert. den.*, 409 U.S. 921 [93 S.Ct. 220, 34 L.Ed.2d 182] (1972). *See* pp. 52–53, *infra.* The constitutionality of Title I certainly should not turn on such formal distinctions of real property law. Whether the classrooms are leased by New York City—and thereby become "public property"—would in no way change the fact that those classrooms presently are free of any religious atmosphere and that the instruction that occurs in those classrooms is separate and distinct from the regular classroom instruction in the nonpublic schools.
Post-Trial Brief of Intervenor-Defendants James and Bessie Bovis at 51.

The routine administrative contacts that occur between Title I personnel and non-public school administrators fall into three basic categories: (1) disseminating information about Title I to the administrators; (2) processing requests for services; and (3) resolving scheduling problems and other questions concerning the implementation of the program. Larkin Aff. ¶ 116. These contacts neither give the parochial school officials any control over the program nor involve Title I personnel in the affairs of the parochial schools. *See generally id.* ¶¶ 117–27.

■ Minor administrative contacts between public employees or officials and religious authorities do not violate the Establishment Clause. *See Wolman v. Walter, supra,* 433 U.S. at 246 n.13, 97 S.Ct. at 2604 n.13; *Walz v. Tax Comm'n, supra,* 397 U.S. at 674–76, 90 S.Ct. at 1414–15. Although the interaction here may be more extensive than in prior cases, it appears to fall within the realm of permissible government-church contacts. The *Meek* Court feared that the presence of public school teachers in parochial schools "has the potential for provoking controversy between the Commonwealth and religious authorities over the extent of the teachers' responsibilities and the meaning of the legislative and administrative restrictions on the content of their instruction." 421 U.S. at 372 n.22, 95 S.Ct. at 1766 n.22. This potential for controversy has not been realized in New York City's Title I program. The Title I teachers' responsibilities are clearly defined, and the nonpublic school officials understand that they have no control or authority over the program. The record demonstrates that the program's design and implementa-

tion have successfully avoided any confrontation · between government officials and parochial school administrators. *See, e. g.,* Larkin Aff. ¶¶ 113, 127; Affidavit of Bernice Kagel, sworn to April 5, 1979, ¶ 9; Affidavit of Faith Rubin, sworn to April 5, 1979, ¶ 18; Affidavit of Sister Miriam Blake, sworn to April 3, 1979, ¶ 15; Affidavit · of Sister Mary DeSales, sworn to April 3, 1979, ¶¶ 13, 14.[14]

Title I is fundamentally different than those educational aid programs that have been found to create "the potential for divisive religious fragmentation in the political arena." *Tilton v. Richardson, supra,* 403 U.S. at 688, 91 S.Ct. at 2100–2101. The state statutes invalidated in *Lemon, Nyquist,* and *Meek* were directed to a narrow class of beneficiaries, nonpublic schools that were predominantly church-related. The Court feared that annual appropriations for such programs and recurrent legislative evaluations would produce political conflict along religious lines. *Meek v. Pittenger, supra,* 421 U.S. at 372, 95 S.Ct. at 1766; *Lemon v. Kurtzman, supra,* 403 U.S. at 623, 91 S.Ct. at 2116. In the Court's view, "the narrowness of the benefited class" is an important factor in measuring the "potential divisiveness" of any legislative enactment. *Committee for Public Education v. Nyquist, supra,* 413 U.S. at 794, 93 S.Ct. at 2976.

The nationwide class benefited by Title I includes educationally deprived children in both public and nonpublic schools. Only four percent of the national Title I budget is allocated to nonpublic school students, and fewer than one-fourth of the parochial schools in New York City have Title I serv-

---

14. In an opinion recently affirmed by the Supreme Court, a three-judge court in this district stated:

Although *Wolman* does not expressly renounce *Meek*'s theory that aid to a sectarian school's education activities is *per se* unconstitutional, it does revive the more flexible concept that state aid may be extended to such a school's educational activities if it can be shown with a high degree of certainty that the aid will only have secular value of legitimate interest to the State and does not present any appreciable risk of being used to aid transmission of religious views.

*Committee for Public Education v. Levitt,* 461 F.Supp. 1123, 1127 (S.D.N.Y.1978), *aff'd sub nom. Committee for Public Education v. Regan,* —— U.S. ——, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980) (footnotes omitted). The court noted that "this certainty must be achieved without an excessive entanglement of the State with the sectarian institution." *Id.* n.6. Applying this "flexible concept," this Court finds that the requisite "degree of certainty" has been established here without excessive administrative entanglement.

ices on their premises. Legislative consideration of the statute, as well as annual appropriations, are thus far less likely to give rise to political debates about aid to religion. Indeed, although Congress has appropriated funds for Title I since 1965 and has occasionally amended the statute, no evidence of any "divisive religious fragmentation" has been presented. Furthermore, the proportion of the funds allocated to public and nonpublic school students is determined administratively by the New York City Board of Education pursuant to a formula mandating comparable per pupil expenditures. Larkin Aff. ¶¶ 32–35. The amount of money spent for each public and nonpublic school student is thus dictated by statutory and regulatory requirements that have not been the subject of continuous political debate. Finally, the Title I advisory councils that have been established pursuant to a statutory directive, 20 U.S.C. § 2735, have helped to defuse any potential for political tension between the public and nonpublic school sectors. Larkin Aff. ¶¶ 113, 114.

In sum, the evidence presented in this case establishes that New York City's Title I program neither creates excessive administrative entanglement nor results in divisive political fragmentation. *Meek* is therefore distinguishable from the case at bar. The Court concludes that Title I satisfies the third criterion of the Establishment Clause test.

### Conclusion

The Supreme Court has observed that "[t]he task of deciding when the Establishment Clause is implicated in the context of parochial school aid has proved to be a delicate one . . . [that] requires a careful evaluation of the facts of the particular case." *Wheeler v. Barrera, supra,* 417 U.S. at 426, 94 S.Ct. at 2288. Having considered all the evidence presented in this action, this Court concludes that New York City's Title I program does not violate the First Amendment's prohibition against the establishment of religion. The program has a secular purpose and neither advances religion nor creates excessive entanglement between the government and religious author-

ities. While Title I could conceivably engender a program that did not satisfy Establishment Clause standards, this Court will not rule on the basis of abstract propositions. No constitutional infirmity has been revealed on the facts of this case. Accordingly, both the statute and the City's program survive judicial scrutiny.

So ordered.